WILLIAM A. ROGERS et al., Respondents, v. UNION IRON & FOUNDRY COMPANY, Appellant.

St. Louis Court of Appeals, July 19, 1912.    Motion for Rehearing Overruled October 15, 1912.

1. FOREIGN CORPORATIONS: Not Licensed to do Business: Interstate Commerce. A foreign corporation engaged solely in interstate commerce need not comply with Secs. 3039, 3040, R. S. 1909, requiring foreign corporations to obtain a certificate to do business in this State in order to sue in the courts of this State; and, as to interstate commerce, the provisions of said sections are void.

2. ———: ———: ———: Facts Stated. A foreign corporation, operating in another State a furnace for the manufacture of pig iron and other like products, employed a general agent

for the sale of such products, who maintained an office in this State. The general agent employed traveling salesmen to solicit orders for such products, and paid all office and traveling expenses, receiving his compensation from the corporation, on a commission basis. All sales contracts were made in the name of the corporation, and shipments thereunder were made direct to the customer from the place of manufacture in the foreign State. A buyer entered into a contract with the sales agent for a product manufactured by the corporation, which did not expressly stipulate that the product should be shipped from the foreign State, but did provide for "shipment" of the product and that delivery should be made f. o. b. cars St. Louis. The buyer had knowledge of the fact that the product was manufactured by the corporation in another State. *Held*, in view of the fact that the contract provided for the sale of a product manufactured by the corporation and which was known to the buyer to be manufactured by it only in another State, and provided for the shipment of this product to a point within this State, that the contract contemplated an interstate transaction, and did not contemplate the sale and delivery of the product, bought or stored in this State; and hence it is *held* that an action for the breach of the contract is maintainable in this State, although the corporation had not obtained a certificate to do business in this State, in accordance with Secs. 3939, 3940, R. S. 1909.

3. **DEFINITIONS: F. O. B.** The phrase "f. o. b." means free on board a vessel, car, or other conveyance which is to transport goods to a buyer.

4. **CONTRACTS: Construction.** Where a contract admits of two constructions, one of which will render the contract unlawful and the other lawful, the latter must be adopted.

5. **FOREIGN CORPORATIONS: Not Licensed to do Business: Interstate Commerce.** A foreign corporation, operating in another State a furnace for the manufacture of pig iron and other like products, employed a general agent for the sale of such products, who maintained an office in this State. The general agent employed traveling salesmen to solicit orders for such products, and paid all office and traveling expenses, receiving his compensation from the corporation, on a commission basis. All sales contracts were made in the name of the corporation, and shipments thereunder were made direct to the customer from the place of manufacture in the foreign State. The corporation shipped carload lots of its product into this State from the place of manufacture, for delivery to buyers, but, on arrival, the buyers rejected the shipment, or delivery was not made because the buyer's credit was not good, and the cars were thereupon delivered by the general agent to other

Rogers v. Foundry Co.

buyers, with whom contracts for the sale of such products had been made before the shipment arrived in this State. *Held,* that the diversion of the shipments from one set of buyers to another did not make the transaction intrastate commerce, for the reason that the shipments, not having passed from the hands of the importer, remained the subject of interstate commerce until delivered to the second buyers, and for the further reason that the second sales, having been made at a time when the goods were outside of this State, the diversion to such buyers constituted interstate commerce; and hence it is *held* that an action for the breach of a contract of sale made with the corporation is maintainable in this State, although the corporation had not obtained a certificate to do business in this State, in accordance with Secs. 3939, 3940, R. S. 1909.

6. **APPELLATE PRACTICE: Conclusiveness of Trial Court's Finding.** A finding by the trial court on sufficient evidence is conclusive, on appeal.

7. **SALES: Breach of Contract: Measure of Damages: Market Value.** While, ordinarily, in admeasuring the damages occasioned by the buyer's breach of a contract of sale, the rule is, that the market value is to be taken as of the time of the breach, yet that rule has its exceptions, and is not to be applied when common sense and justice forbid.

8. ———: ———: ———: ———. Where a contract for the sale and purchase of pig iron was modified so as to make the time and amount of deliveries depend on the giving by the buyer of shipping instructions within a reasonable time, and the giving of shipping instructions was postponed from time to time by the buyer, until a designated date, when the buyer repudiated the contract, the measure of damages was the difference between the contract price and market value at the date of the repudiation.

9. **RECEIVERS: Breach of Contract: Recovery by Receiver.** Where a party has breached his contract in such a manner as to render performance or tender of performance by the receiver of the adverse party unnecessary, the receiver may proceed to recover damages as on an accrued claim, without adopting the contract or obtaining authority to perform it.

10. ———: **Performance of Bankrupt's Contracts: Tender.** A receiver of a party to a contract has a reasonable time within which to elect to adopt or perform the contract, where performance is necessary; and he cannot be put in fault for not adopting or performing, or tendering performance, before such reasonable time has expired.

11. ———: ———: ———: **Breach of Contract by Adverse Party: Recovery by Receiver.** Where a party to a contract

breaches it before the receiver of the adverse party has had a reasonable time in which to exercise his election as to whether he would adopt or perform it, the receiver is relieved from the duty of performance or tender, and may recover damages for the breach, although he has neither adopted nor performed, nor tendered performance of, the contract.

12. ————: **Assignment of Claim: Sufficiency.** Where the receiver of the seller who had contracted for the sale of certain goods petitioned the court for leave to assign the contract, after it had been breached by the buyer, and the petition recited, as one of the reasons for the assignment to the proposed assignee, that the latter had had entire charge of all matters relating to the contract, and that all negotiations relating thereto had been conducted by him, and that he was familiar with the details, and an assignment executed by the receiver, in pursuance of an order of court, granted all the right, title and interest of the bankrupt in and to the contract and appointed the assignee to take all legal measures which might be proper for the enjoyment of the assigned premises, there was a sufficient assignment to authorize the assignee to sue on the contract for damages for its breach.

13. **APPELLATE PRACTICE: Binding Effect of Theory at Trial.** Where a cause was tried on the theory that an assignment was sufficient, the defeated party could not, on appeal, raise the question of the insufficiency of the assignment.

14. **ACCORD AND SATISFACTION: Consideration.** There must be a consideration to support an accord and satisfaction.

15. **CONTRACTS: Consideration: Payment.** The payment of a debt clearly due does not constitute a sufficient consideration to support a contract.

16. **ACCORD AND SATISFACTION: Acts Constituting: Consideration.** Where a buyer sent a check to the seller for the exact and undisputed amount due for goods delivered, the fact that he stated in the letter with which the check was enclosed, that it was in full settlement of the account, would not work an accord and satisfaction of the seller's claim for the buyer's breach of the contract of sale in refusing to accept the balance of the goods, since there was no consideration to support an accord and satisfaction and the tender of the amount due was not made in such manner or under such circumstances as to cause the seller to understand it was intended to effect a settlement of his claim for breach of contract.

Appeal from St. Louis City Circuit Court.—*Hon. William B. Homer,* Judge.

AFFIRMED.

*Alroy S. Phillips* for appellant.

(1)   Where a foreign corporation appoints a sales agent with exclusive right to sell its goods and authority to make contracts, and such an agent maintains a branch office in Missouri where he makes contracts on behalf of the corporation, grants requests for cancellation, extends the time for delivery, makes collections, and in general does in behalf of the corporation all acts necessary to be done in connection with such contracts, the corporation does not come within the exception of Secs. 3039-40, R. S. 1909, as to "drummers or traveling salesmen soliciting business in this State for foreign corporations which are entirely nonresident;" and where such agent made contracts which were cancelled and at least ten times in one year, applied on existing contracts goods which were in the State at the time by reason of having been shipped into the State under other contracts and rejected by or not delivered to the purchaser, such corporation is doing business in the State in violation of the statute and a contract made by the corporation in this State is void *ab initio*.   Secs. 3039-40, R. S. 1909; Amusement Co. v. Amusement Co., 192 Mo. 404; Machinery Co. v. Ramlose, 210 Mo. 631; Lead & Zinc Co. v. Mining Co., 221 Mo. 7; Text Book Co. v. Gillespie, 229 Mo. 397; Fruit Co. v. McKinley Bros. & Co., 103 Mo. App. 304; Buggy Co. v. Priebe, 123 Mo. App. 521; Harding v. Railroad, 80 Mo. 659; Strain v. Portrait Co., 126 Fed. 831; Cone v. Manufacturing Co., 76 Fed. 891; Irons v. Rogers, 166 Fed. 781; 7 Cyc. 416; Ware v. Moline County, 146 Ala. 163; Coe v. Errol, 116 U. S. 517; New York ex rel. v. Reardon, 204 U. S. 152; State v. Looney, 214 Mo. 216; Emert v. Missouri, 156 U. S. 276; Bank v. Leeper, 121 Mo. App. 688.   (2) Where a dispute has arisen over the cancellation of a contract and over the payment of interest on amounts due for prior purchases, and the

debtor sends the creditor a check for the exact amount of the principal and interest due on the prior purchases, enclosed in a letter sufficient to inform the creditor that the check is tendered as payment in full, if the creditor accepts and cashes the check, even though under protest, there has been an accord and satisfaction of all matters in dispute, and it is error to give a declaration of law making the sufficiency of the tender to depend entirely upon the understanding of the creditor. Anderson v. Contracting Co., 100 Mo. App. 599; 1 Cyc. 333; Lightfoot & Son v. Hurd & Co., 113 Mo. App. 612; Bahrenburg et al. v. Fruit Co., 128 Mo. App. 526; Kneisley Lumber Co. v. Edward B. Stoddard Co., 113 Mo. App. 306; Railroad v. Gould, 44 Kan. 68. (3) Where the time of delivery of goods under a contract depends upon the giving of shipping instructions by the buyer and there is no time specified within which such notice shall be given, the failure or refusal of the buyer to give such notice within a reasonable time constitutes a breach of the contract, and where such refusals continue over a period of time the cause of action accrues on the first refusal made within a reasonable time, and the damages must be computed as of that date. The vendor is not entitled to have his damages computed as of the date of the last of such refusals unless he can show since the first breach, a new valid agreement extending the time for the giving of such notice or reviving the broken contract. 35 Cyc., pp. 124, 179, 182, 183-4; 9 Cyc., pp. 611, 613-15; Canda v. Wick, 100 N. Y. 127; Brown v. Muller, L. R. 7, Exch. 324; Plevins v. Downing, 1 C. P. D. 220, 225; Brown v. Asphalt Mfg. Co., 210 Mo. 260. (4) Where a receiver is appointed for a corporation with power to collect its debts, he has no power, without an order of court, to perform any of its executory contracts except those the performance of which is a condition precedent to the collection of an existing debt. Under powers authorizing him to continue the

business and perform the contracts, he has the right
to elect to adopt or to repudiate an executory contract
which is advantageous to the corporation, which right
of election is restricted to the receiver and must be
exercised within a reasonable time, and he cannot
recover damages for the breach of such contract un-
less within a reasonable time he notifies the other
party of his intention to adopt the contract and per-
form it.  If before such notice is received the other
party has transactions with the former agent of the
corporation amounting to a breach, which transac-
tions are not communicated to and acted upon by the
receiver, the giving of notice by the receiver is not
excused nor do such transactions constitute a breach
because the effect of the receivership is to terminate
the agency and make the transactions *res inter alios
actae.*  Trust Co. v. Railway, 150 U. S. 287; 34 Cyc.
258, 261; Beach on Receivers (Alderson, 1897), Sec.
328, pp. 330, 331, 332; Mining Co. v. Brown, 124 U. S.
385; Gas Co. v. Hanby, 101 Ala. 15; 31 Cyc., pp. 1311,
1590, 1595. (5) The assignment of all of the assignor's
right, title and interest in and to a contract does not
convey a claim for damages for its breach which had
accrued prior to its assignment.  Love v. Every, 18
Mo. App. 196; Vapor-Engine Co. v. Gas-Engine Co.,
49 Fed. 68.

*A. & J. F. Lee* and *Charles M. Polk* for respond-
ents.

(1) The contracts, as to the time of shipments,
were modified by the mutual assent of the parties and
no new consideration was necessary therefor.  The
refusal finally to give orders for the shipment of the
iron remaining to be delivered constituted a breach
of the contracts, as of the date of such refusal.  35
Cyc. pp. 124, 125; Pottery Co. v. Falckmeier, 131 Mo.
App. 105; Hinkley v. Pittsburgh Steel Co., 121 U. S.
264; Lumber Co. v. Warner, 93 Mo. 374; Claudius v.

Amusement Co., 109 Mo. App. 346; Bertold v. Construction Co., 165 Mo. 280; Nelson v. Cal Hirsch & Sons, 102 Mo. App. 515. (2) The measure of damages on account of the breach of the two contracts is the difference between the agreed price for the number of tons of iron which the appellant failed to take and pay for and the market price of such amount of iron, of the quality specified in the contracts, in the city of St. Louis, Missouri, on the day of the breach or within a reasonable time thereafter. Range Co. v. Mercantile Co., 120 Mo. App. 538; Rickey v. Tenbroeck, 93 Mo. 563; Bertold v. Construction Co., 165 Mo. 280; Bank v. Ragsdale, 171 Mo. 168. (3) The business done by the Napier Iron Works and the Sheffield Coal and Iron Company in Missouri was and is wholly interstate commerce, and is in no way prohibited by secs. 3039 and 3040, R. S. 1909. The contracts with the appellant were therefore valid and enforcible. Steamheating Co. v. Gas Fixture Co., 106 Mo. App. 148; Williams v. Scullin, 59 Mo. App. 30; Blevins v. Fairley, 71 Mo. App. 259; Amusement Co. v. Amusement Co., 192 Mo. 404; Shoe Co. v. Shoe Co., 156 Fed. 1; Railway v. Whitehead, 26 S. W. 173; Charge of Judge Grosscup, 62 Fed. 831; Cook v. Brick Co., 98 Ala. 413; Miller & Co. v. Goodman, 91 Tex. 41; Indiana v. Pullman Co., 16 Fed. 193; Text Book Co. v. Gillespie, 229 Mo. 397; Text Book Co. v. Pigg, 217 U. S. 91; Stockard v. Morgan, 185 U. S. 27; Manufacturing Co. v. Ferguson, 113 U. S. 735; People v. Mining Co., 105 N. Y. 83; Bank v. Leeper, 121 Mo. App. 693; Lumber Co. v. Insurance Co., 73 N. Y. Supp. 668; Penn Collieries v. McKeever, 87 N. Y. Supp. 869; Mearshon & Co. v. Lumber Co., 187 Pa. 12; People ex rel. v. Roberts, 8 App. Div. (N. Y.) 201; People ex rel. v. Roberts, 47 N. Y. Supp. 949; Burrowes v. Caplan, 111 N. Y. Supp. 498. (4) There was no accord and satisfaction between the appellant and respondent's assignors. (5) The appointment

of the receiver for the Sheffield Coal and Iron Company did not affect the liability of the appellant, which had breached its contract with the company for which said receiver was appointed before the receiver had had a reasonable time to elect to perform the contract. Wolf v. Bank, 178 Ill. 85; Parker v. Hull, 46 Ill. App. 471; 34 Cyc., p. 341; Beach v. Receivers, Sec. 332. (6) The appellant was given due notice of the assignment and a copy thereof, and agreed in writing that the assignment conveyed the cause of action of said Sheffeld Coal and Iron Company to the respondents; did not raise the issue as to the sufficiency of this assignment in its answer; did not object to the introduction of the assignment or raise any issue as to its sufficiency at the trial of the case; did not specifically call the court's attention thereto in its motions for a new trial and in arrest, and has raised the point for the first time in this court; the court therefore cannot now consider the sufficiency of this assignment. Nickett v. Railroad, 135 Mo. App. 661; Gordon v. Park, 202 Mo. 236; Williams v. Lobban, 206 Mo. 399; Shoe Co. v. Odd Fellows Hall, 133 Mo. App. 229; Kansas City v. Youmans, 213 Mo. 151. (7) The assignment is sufficient to convey the cause of action of the Sheffield Coal and Iron Company to the respondents. 4 Cyc., pp. 73, 75; Smith v. Sterrett, 24 Mo. 262; Macklin v. Kinealy, 141 Mo. 113; Sanguinette v. Webster, 153 Mo. 343; U. S. v. Hickey, 17 Wallace, 9. (8) Every presumption must be indulged in favor of the regularity and correctness of the acts and rulings of the circuit court. Phelps v. Zinc Co., 218 Mo. 572; Vincent v. Means, 207 Mo. 709.

STATEMENT.—Suit to recover damages for breach of two contracts for the sale of pig iron. The petition was in two counts. The trial was to the court, a jury being waived, and plaintiff had judgment on

both counts of the petition and the defendant has appealed. As no point is made as to the pleadings, it is unnecessary to set them forth.

It appears from the evidence, which consisted partly of an agreed statement of facts, that on and prior to April 17, 1907, and thereafter, the Sheffield Coal and Iron Company and the Napier Iron Works were corporations for pecuniary profit organized under the laws of Alabama and Tennessee, respectively, and operating furnaces at Sheffield, Alabama, and Napier, Tennessee, respectively, at which places all their pig iron and other products were manufactured. Neither of them had ever done anything required of foreign corporations in order to be licensed to do business in Missouri, and neither of them had or kept any property, books, office or place of business in this State. The plaintiffs, a partnership under the firm name of Rogers, Brown and Company, were iron brokers, having a main office at Cincinnati, Ohio, and a branch office in St. Louis, Missouri. They were agents for the sale of pig iron and like products for forty furnaces, including those of the Sheffield Company and Napier Iron Works. As such agents they sold the entire foundry pig iron output of the Sheffield Company, and a large part of the foundry pig iron output of the Napier Iron Works. From their branch office in St. Louis, they sent out salesmen to travel about Missouri and other states, soliciting orders for said two corporations and other corporations which they were authorized to represent as sales agents. They were the only ones authorized to solicit orders in Missouri for said two corporations but they were not confined to Missouri in doing soliciting. They had general authority to make and execute contracts for said two corporations for the sale of their foundry pig iron output in Missouri and other States at prices previously quoted to them. They never made a sale not within such general authority, without first pro-

curing specific authority to do so. They were compensated on a strictly commission basis, and paid their own office, traveling and other expenses, neither of said corporations contributing thereto. Sometimes they delayed shipments at the request of a customer and even cancelled contracts, but never without first communicating with their principal and obtaining specific authority to do so. All sale contracts were made by the plaintiffs in the names of their principals, and said corporations did all of their shipping from outside the State into Missouri and always shipped direct to the purchaser with whom the sale of the property had been negotiated before it arrived in Missouri. There were, however, some exceptional instances where iron was shipped to the plaintiffs on consignment, but none of those shipments ever came into Missouri until a purchaser had been procured for it and then it came into the State directly to the purchaser. There were also several instances of so-called "diverted shipments," that is, where a car of iron had been shipped into Missouri consigned to one to whom a sale of it had been previously negotiated, and when it arrived here, either in the railroad freight yard or at the foundry of the purchaser, the purchaser rejected it or the plaintiffs discovered that the purchaser was not "good pay." In such cases the plaintiffs had the car of iron delivered to some other person with whom a sale of iron of the same grade, etc., had been negotiated before this car had arrived in the State. The defendant is a Missouri corporation having a foundry and place of business in the city of St. Louis, Mo.

On April 17, 1907, in St. Louis, Missouri, the plaintiffs, by their salesman representative, Edward Gross, acting as agents under their general authority for the Napier Iron Works, solicited and made and executed a contract with the defendant for the sale to the defend-

ant of 150 tons of Napier No. 2 Foundry Pig Iron, as follows:

"(Buyer will please sign and return this copy)  
PIG IRON CONTRACT      No. 10297  
Issued from the office of     Buyer's No.  
ROGERS, BROWN & COMPANY  
Furnace Agents.

SOLD TO   Union Iron & Foundry Company, St. Louis, Mo.

QUANTITY   150 tons.

GRADE   Napier No. 2 Fdy.

PRICE   Per ton 2240 lbs. $22.25 del'd. f. o. b. cars St. Louis. Subject to change of freight rate.

PAYMENT   Freight cash by buyer. Balance, cash 30 days. Invoices will be sent and collections made by Rogers, Brown & Company, Cincinnati, O. If this lot is divided in shipment, settlement shall be made for each shipment as though a separate sale. Failure to make payments when due shall forfeit buyer's right to further deliveries.

SHIPMENT   25 tons per month beginning July. Subject to possible delay from strikes, accidents, or other causes beyond the reasonable control of the seller. This contract is completely set forth herein.

ROUTE   Via.

ACCEPTED   THE UNION IRON & FOUNDRY COMPANY.

(Buyer please sign here)    W. J. Patchell, Pres.

   NAPIER IRON WORKS,

    Per Rogers, Brown & Co. Agents.

         By Edw. Gross.

Received April 19, 1907.

  Rogers, Brown & Co."

On April 25, 1907, in St. Louis, Mo., the plaintiffs by their same representative, acting as agents under specific authority for the Sheffield Company solicited, made and executed a contract with the defendant for the sale by the Sheffield Company to the defendant, of pig iron, which contract was the same as the Napier contract except that the quantity sold was 300 tons, the grade Sheffield No. 2 Foundry, the price per ton "$22.50 delivered f. o. b. St. Louis, subject to change in present freight rate $3.30." The shipment was to be 75 tons per month, September to December, and the route via L. & N. It, of course, was signed in the name of the Sheffield Company. The July 25 tons were duly delivered and accepted under the Napier Iron Works contract. On August 7, 1907, the defendant wrote the plaintiffs asking them to "please withhold shipment of iron covered by our contracts, until further notice." On August 8, 1907, the plaintiffs answered said letter, saying: "We are advising both the Napier and Sheffield furnaces to discontinue shipments on your contracts until further notice. We trust you will advise us in ample time when to resume shipments."

Mr. Gross, plaintiff's representative, testified on behalf of plaintiffs, that after these letters were exchanged, he called on Mr. Patchell, the president of defendant company, every two or three weeks asking for shipping instructions under the contract, but Patchell refused to give them, saying that he could not use the iron at that time and asking that the shipments be held up. On October 25, 1907, Patchell told him that he could not order forward any shipments at the present time, but would probably do it in December. On November 25, 1907, Patchell told him he could not use any more iron that year. Nothing was said at any of these times about new business, or about cancelling the contracts. On December 9, 1907, Patchell told Gross that the Sheffield Company had

gone into the hands of a receiver. Such was the fact; on December 6, 1907, Benjamin Strong, Jr., was duly appointed receiver of the Sheffield Company by the circuit court of the United States for the District of New Jersey, a court of general jurisdiction, with authority to collect the debts of said corporation.

On December 14, 1907, defendant by its president, Patchell, wrote plaintiffs a letter as follows, this being, according to plaintiff's version, the first time cancellation of the contract was mentioned: "We herewith enclose our check for $1258.13, settlement in full of your account. Please acknowledge receipt. As we can see no immediate possibility of using or paying for any iron not now delivered on our contracts, you will please cancel same."

This letter and the check in it were received by the plaintiffs on December 16, 1907, on which day they answered it as follows: "We are pleased to acknowledge receipt of your check for $1258.13, settlement in full of your account. We are forwarding same to Cincinnati today. Referring to the last paragraph of your letter, it is impossible for us to cancel the unshipped tonnage on your contracts. The furnaces have the iron in stock and are willing to make shipment, but will not agree to cancellation. The furnaces are perfectly willing to extend deliveries on your contracts until the first quarter of 1908. We will be pleased to receive your shipping instructions so we can advise the furnaces just when you expect to take care of the iron."

The defendant received this last letter December 17, 1907. The check was for the exact amount due from the defendant for the July shipment under the Napier contract and for previous shipments under other contracts, with interest to date, and plaintiff's witnesses testified on cross-examination that they understood that that was all the check was tendered

in settlement of, not that it was tendered in consideration of the cancellation of the contracts. Thereafter Gross saw defendant's president, Patchell, with reference to securing instructions for shipments under the contracts, but did not receive any. Patchell simply said that they could not use the iron, had iron in their yard, could not pay for more. On behalf of defendant, Patchell testified to the effect that the first time Gross called, after the letter of August 7, 1907, he, Patchell, not only refused to give shipping instructions, but got angry and vehemently repudiated the contract, declared it cancelled, and "stood pat" on that. That in the conversations of October and November with Gross, he, Patchell, said nothing more than that at any time they were in the market for iron they would give Gross' company the preference. All this, Gross, being recalled, denied. As to his conversation with Gross on December 9, 1907, it appears that Patchell testified at a former trial as follows: "Well, I'll say that prior to that conversation Mr. Gross intimated to me that he didn't think it would be so hard to get the Sheffield people to let up on the enforcement of those contracts, because they were not in very good financial way, and along the early part of December, it was either the 8th or 9th, or somewhere along there, Mr. Gross told me that the Sheffield Company were in the hands of a receiver, and he guessed that they couldn't furnish the iron anyway. 'Well', I says, 'I bought Sheffield iron; we don't want anything but Sheffield iron; we don't want iron from any other locality down there; we want the Sheffield iron.' Well, he intimated to me that they couldn't furnish it."

The market price of the iron called for by the contracts was equal to or higher than the contract price from July 1 to October 1, 1907, and thereafter it was as follows: "October 1 to October 24, $22.00; October 24 to November 14, $21.50; November 14 to November 28, $20.50; November 28 to December 5,

$19.75; December 5 to December 12, $19.00; December 12 to December 31, $17.50.'' There was no change in the freight rate to affect the matter.

The evidence tends to prove without contradiction that the Sheffield Company and its receiver and the Napier Iron Works were at all times ready, able and willing to perform and carry out their respective contracts with the defendant, unless it be that the appointment of the receiver disabled the Sheffield Company from itself performing.

As to the capacity in which plaintiffs sue, the agreed statement of facts contains the following: ''On November 23, 1908, by his petition hereto annexed, marked 'Exhibit A,' and made a part hereof, said receiver prayed said court for authority to assign to plaintiffs his cause of action under the contract mentioned in the suit herein; that on November 27, 1908, said court made the order hereto attached marked 'Exhibit B' and made a part hereof, granting the prayer of said petitioner; that on December 9, 1908, said receiver executed the assignment to plaintiffs of his cause of action aforesaid, hereto attached, marked 'Exhibit C' and made a part hereof; that on December 9, 1908, the Napier Iron Works executed to plaintiffs the assignment of their cause of action hereto attached, marked 'Exhibit D', and made a part hereof; that plaintiffs in bringing this action are trustees of an express trust for said receiver and for said Napier Iron Works, and are required to account to said receiver and to said Napier Iron Works for the amount collected, if any, through this action; that on January 6, 1909, plaintiffs served upon defendant the notice of said assignments and of the demand of plaintiffs against the defendant, hereto attached and made a part hereof, marked 'Exhibit E.' ''

It is unnecessary to set forth the various papers referred to as exhibits in said agreed statement. It is sufficient to say that it clearly appears from the

petition for leave to the receiver to assign to these plaintiffs, and the order granting such leave, that it was the intention of the receiver and of the court to whom he addressed said petition, that the assignment should be of the very cause of action in damages for breach of contract which is sued upon herein. The petition recites as one of the reasons for making the assignment to these plaintiffs, that they "have had entire charge of all matters relating to this contract, and that all negotiations relating thereto were conducted by them. That they are thoroughly familiar with all the details," etc. By the assignment which the receiver made in pursuance of said leave granted he purported to assign "all the right, title and interest of the said Sheffield Coal and Iron Company in and to" the aforesaid Sheffield contract, describing it, and constituted and appointed the plaintiffs his attorneys in his name, or otherwise, but at their own cost, "to take all legal measures which may be proper or necessary for the complete recovery and enjoyment of the assigned premises." As the sufficiency of the assignment by the Napier Iron Works is not questioned, we need not mention it further.

The trial court fixed the amount of plaintiff's damages at the difference between the contract prices and the market value, taking the market value in December, 1907.

CAULFIELD, J. (after stating the facts).— 1. There is no merit in defendant's contention that plaintiffs must fail in their suit because their assignors were "doing business" in contravention to Secs. 3039 and 3040, R. S. 1909. It may be conceded, without deciding, that such assignors were "doing business" within the meaning of those sections, but in our opinion whatever business was so done constituted interstate commerce and it has been held that said sections are null and void and should be dis-

regarded in so far as they apply to and affect foreign corporations engaged in interstate commerce. [International Text Book Co. v. Gillespie, 229 Mo. 397, 129 S. W. 922.]   Defendant's counsel concedes in his brief that there was no evidence that plaintiffs' assignors were doing other than an interstate business, unless it be in the making of the contracts in suit or the dealings in respect of the so-called "diverted shipments."

As to the contracts he contends that as they are executory and do not expressly require the iron to be brought from another State directly to the purchaser in the State, they must be interpreted to contemplate the sale and delivery in Missouri of iron bought or stored in Missouri.   In other words he would have us hold that the contracts contemplate intrastate commerce because not expressly requiring interstate shipments.   We do not feel warranted in so interpreting the contracts.   In the first place, the iron was to be that which was manufactured by the respective sellers, for one contract called for iron known as "Sheffield No. 2 Fdy." and the other for "Napier No. 2 Fdy."   The defendant clearly understood that such designations meant iron of the seller's own manufacture, for it appears from its president's testimony that when he had heard that the Sheffield Company was in the hands of a receiver and that they could not furnish iron, he had vehemently asserted to plaintiff's representative:   "I bought Sheffield iron; we don't want iron from any other locality down there; we want Sheffield iron."   Again, at the last trial, defendant's attorney objected to the introduction of certain bills of lading showing that the Sheffield Company had shipped iron to various parties about the time this contract was breached, stating that one of the points in the case is that the Sheffield Company "had no iron of their own," that there was no showing that the iron called for in the bill of

lading was Sheffield iron, and that the witness could not testify that the iron called for in the bill of lading was "actually made at the Sheffield Company's furnace." Neither of the sellers had any plant or furnace in the State of Missouri, so such manufacturing or smeltering must have been intended to be done elsewhere; that is, at their furnaces in Sheffield, Alabama, and Napier, Tennessee, respectively. The contracts show that the iron was to be "shipped," for they both speak of shipment and freight charges. If there was any doubt as to this, it would be dispelled by the letters of the parties subsequently exchanged and by the provisions of the contracts that delivery was to be "f. o. b. cars St. Louis." "F. o. b. means, free on board the vessel, cars or other conveyance which is to transport it to the buyer." [3 Words & Phrases, p. 2636 and cases cited.] St. Louis was the place where the buyer was located, and must have been intended as the destination of the shipment. So we have it that the iron contracted for was to be manufactured by the sellers in other States and shipped by them on cars into Missouri, there to be delivered on board such cars to the buyer. This seems to effectively exclude the idea suggested by defendant's counsel that the contracts contemplated the delivery of iron "bought in Missouri or stored here." But if we had any doubt in that respect it would be our duty to resolve it in favor of the plaintiffs, for one of the rules for interpreting contracts is, that, "if the terms admit of two meanings, or two ways of effecting the object, by one of which the thing would be unlawful and by the other lawful, the latter construction must be adopted." [Bishop on Contracts, Sec. 392.] We are also of the opinion that as the contracts contemplated interstate commerce alone, they were part of interstate commerce so as to be without the lawful scope of the statutory provisions in question. A statute could not more

effectually, if not directly, apply to interstate commerce than by rendering void all contracts for the sale and delivery of the goods to be transported from one State to another. If our statute has that effect, then, under the decision of our Supreme Court, to that extent it is void.

As to the dealings of the plaintiff as agents of the seller in respect of the so-called "diverted shipments," the evidence discloses that in several instances the Sheffield Company and the Napier Company had shipped cars of iron into St. Louis for delivery to persons or concerns which had previously contracted for such iron, but on arrival in St. Louis, either in the railroad freight yard or at the foundry of the purchaser, it was discovered by the plaintiffs that the purchaser was not "good pay" or rejected the shipment. Then the car or cars were taken by the plaintiff as agents of the seller and delivered to other persons or concerns with whom likewise the seller had made a contract for the sale of iron before such iron had arrived in the State and such delivery was made to such other person or concern under such preexisting contract. Such diverting of shipments from one previously-secured customer to another previously-secured customer was not an intrastate transaction as .distinguished from an interstate transaction. In the first place, such iron had not passed from the control of the importer and still remained in the car transporting it, which may be likened unto the original package, and remained the subject of interstate commerce until delivered to the second customer, [See State v. Emert, 103 Mo. 241, 15 S. W. 81; Leisy v. Hardin, 135 U. S. 100; Miller & Co. v. Goodman, 91 Texas, 41, 40 S. W. 718.] And in the second place, the second sale had been made at the time when the goods were outside of the State of Missouri for the purpose of introducing them into the latter State and therefore the transaction constituted interstate com-

merce. [State v. Looney, 214 Mo. 216, 97 S. W. 934, 99 S. W. 1165; State v. Emert, supra.] We may also add that, in our opinion, such diverting of shipments caused in the way it was caused cannot possibly be distorted into the doing of business outside of interstate commerce business. Such diverting was necessary to the carrying on of interstate commerce business and cannot be penalized without seriously hampering such interstate commerce business. It, too, then, must be regarded as without the scope of our constitutional provisions.

II. Both parties agree that the measure of plaintiff's damages is the difference between the contract price and the market value, but the question of the time when the market value was to be taken is a matter of dispute. The trial judge took it in December, 1907, when the market price was four dollars and seventy-five cents per ton less than the Napier contract price and five dollars per ton less than the Sheffield contract price. Defendant contends that it should have been taken in August, 1907, when the market price was greater than the contract price. Defendant bases this contention upon the alleged fact that it repudiated the contract in August, 1907, and therefore the breach occurred then, but the trial court found that fact against the defendant and its finding is binding on us.

The parties agree that the effect of the written request to withhold shipments "until further notice" and the reply thereto was to modify the contract so as to make the time and amount of deliveries depend upon the giving of shipping instructions by the defendant, such instructions to be given within a reasonable time. The trial court found that, in December, 1907, such reasonable time had expired and that then for the first time the defendant repudiated the contracts. It may be that such reasonable time expired

before December, and that the seller might have claimed a breach and had the market value taken as of the time of such expiration, but it does not follow that therefore the market value should have been taken as of the time of such expiration. While the rule is that the market value is to be taken as of the time of the breach, this is because ordinarily the injured party can thus best be compensated for his pecuniary loss. Upon the breach he can go into the market and resell and thus determine the amount of his loss. But that rule, like other rules, has its exceptions and is not to be applied when common sense and justice forbid, as we think they do here. The evidence tends to prove and the trial court found, that the giving of shipping instructions had been postponed from time to time by the plaintiffs at the request of the defendant, until December, when the defendant repudiated the contracts. Until the repudiation, plaintiffs were induced by the defendant to carry over and postpone the matter of protecting themselves against loss by a resale. When the repudiation occurred, the market had fallen and a resale would leave them a substantial loss. Under these circumstances to take the market value as of a time anterior to the repudiation would be to visit upon the plaintiffs a loss which was caused solely by their forbearance induced by the defendant and would permit the defendant to profit by its own wrong. The law does not require or sanction such an injustice in measuring damages. [Ogle v. Earl Vane, L. R., 3 Q. B. 272 (decided in 1868).] We are of the opinion that the trial court properly took the market value in December, upon the facts as it found them.

III. Defendant contends that respondent cannot recover on the Sheffield contract because the receiver did not adopt or have authority to perform it. We suppose this contention is based on the theory that the party claiming a breach of a contract must not be

in fault concerning the thing complained of, and if something remained for him to do under the contract, he must show performance or readiness to perform. And we may assume that adoption by the receiver and authority for him to perform were necessary to such readiness on his part. But the only purpose of adoption and procurement of authority to perform is to bind and enable the receiver, as such, to specifically perform, and of course neither is necessary if nothing remains for him to do or tender under the contract in order to hold the defendant liable for a breach. If nothing remains for the receiver to do under the contract his adoption or procurement of authority would be useless. If the other party has breached the contract in such a manner as to render performance or tender by the receiver unnecessary, the latter is without fault and may proceed to recover damages as an accrued claim, just as he could recover upon a note forming part of the assets of the estate. It is also true that the receiver is to have a reasonable time within which to elect to adopt or perform, if performance on his part is necessary, and he cannot be put in fault for not adopting and performing or tendering performance before such reasonable time has expired. Likewise, if before such reasonable time has expired, the other party breaches the contract by repudiating it and thereby relieves the receiver from the duty of performance or tender, the receiver cannot thereafter be put in fault by failing to do the wholly unnecessary things of adopting the contract and procuring authority to perform. In such case the receiver can maintain a suit to recover damages for the breach, because he is without fault in the thing of which he complains and the defendant is in fault. In this case the defendant, before such reasonable time for electing to adopt and perform expired, repudiated the contract and thereby relieved the receiver from the duty of performance or tender, and of course relieved him from

the necessity of adopting. We rule this point against the defendant.

IV.  Defendant further contends that the assignment by the receiver to the plaintiffs is insufficient; that he assigned only his interest in the contract, and not his claim for damages for its breach, which had accrued and vested in him long prior to the assignment.  We think the assignment is sufficient, when read in connection with the petition of the receiver for authority to assign the claim and the order of the court authorizing the assignment.  But in any event the point is not open to the defendant because it tried the case on the theory that the assignment was sufficient.  In the statement of facts the parties speak of the assignment as an assignment by the receiver of his "cause of action," and in no way questioned the sufficiency of the assignment in the trial court.

V.  There is no merit whatever in defendant's last contention, that an accord and satisfaction of the causes of action was accomplished by the transmission of the check for $1258.13 by the letter of December 14 and the collection and appropriation of the proceeds of said check by the plaintiffs or the receiver.  That check represented the exact amount of defendant's indebtedness on other matters not connected with the matters involved in this suit, and such indebtedness was liquidated, due and undisputed.  There must be a consideration to support an accord and satisfaction (Scott v. Parkview R. & I. Co. Mo. ——, 145 S. W. 48); and the payment of a debt clearly due does not constitute a sufficient consideration to support any kind of a contract or agreement.  [Swaggard v. Hancock, 25 Mo. App. 596.]  There was no compromise because there was nothing conceded by the defendant.  [Scott v. Parkview R. & I. Co., supra.]  Nor do we believe the tender of the $1258.13 due on other mat-

ters was made in a manner or under such circumstances that any reasonable mind could understand it to apply on the matter here involved. On the contrary the reference is inevitable and conclusive that the defendant intended nothing more than to pay its conceded indebtedness.

The judgment is affirmed. *Reynolds, P. J.,* and *Nortoni, J.,* concur.

**St. Louis Court of Appeals, July 19, 1912.     Motion for Rehearing Overruled October 15, 1912.**