JOSEPH D. MILES, Administrator of the Estate of Marcus H. Moore, Deceased, Respondent, v. MACON COUNTY BANK of Macon, Missouri, and CITIZENS BANK of Macon, Missouri, Appellants.

Kansas City Court of Appeals, February 15, 1915.

1. **BANKS AND BANKING: Selling Assets: No Authority from Board of Directors.** Under Sec. 112, R. S. Mo. 1909, the cashier of a bank cannot assign a note belonging to his bank without a resolution duly passed authorizing such transfer, and this applies to a note held as collateral as well as to any other asset of the bank. Such assignment is void and passes no title to the assignee.

2. ——: ——: ——: **Rights of Transferee.** As the unauthorized transfer passed no title, the transferee was not debarred from demanding the return of his money taken for the note since he knew nothing of the facts constituting the illegality of the transfer and was not a party to the wrongful or fraudulent act. Nor would his demand of the note while he was in ignorance of the facts bar him from afterwards insisting upon the return of the money after he discovered that he obtained no title to the note.

3. ——: **Sale of Bank's Assets to Another Bank: Contract to Pay Debts of Former.** A bank which had voluntarily gone into the hands of the bank examiner transferred all its assets to a new and succeeding bank. The contract entered into between the two banks examined and held to be an agreement whereby the new bank assumed all the debts of the old. *Held*, further, that plaintiff's claim is within the scope and meaning of the contract. Such cannot be limited, controlled or determined by any construction which places special and unnatural emphasis on a word or phrase of the contract when its whole import is considered.

Miles v. Bank.

4. ———: Notes Deposited with Bank for Collection: Cashier or Bank Agent of Depositor. Evidence examined and held to show that the plaintiff's decedent in leaving notes at the bank for collection left them with the bank and not merely with the cashier as decedent's individual agent.

5. PLEADING: Petition: Contracts: Performance. Where a petition alleges all the facts sufficient to show that plaintiff was a creditor of the old bank, that it made a contract with a new bank and under it turned over all of its assets to the new on condition that the latter would pay the former's debts, the necessary implication is that the new bank accepted performance of the terms of the contract and that plaintiff was among those for whose benefit the contract was made. Where no attack is made on the petition, it will not be treated as stating no cause of action whatever because some of its allegations may be regarded as legal conclusions.

6. ESTOPPEL: Waiver: Drawing Deposit. The fact that plaintiff drew out of the new bank the amount appearing to his credit therein as transferred from the old bank did not estop or bar him from suing for the claim herein demanded, since the payment of such deposit was not in the nature of a settlement of the affairs between them nor was the acceptance of said deposit an admission that it was in full of all amounts due, and payment thereof was no more than the new bank's duty under the admitted terms of the contract.

7. ———: ———: Account Stated. Nor is plaintiff confined to the amount of such deposit as upon an account stated in the depositor's pass book. There was no such knowledge of the facts as would render the book an account stated, nor was there any element of estoppel since the new bank was not thereby led to change its position.

8. ULTRA VIRES. To constitute a defense, *ultra vires* must be pleaded. But a corporation cannot receive money to do a thing and fail to do it, and, after keeping the money, excuse itself on the ground of *ultra vires*.

9. COMPROMISE AND SETTLEMENT. An offer of compromise which was not definitely accepted can be withdrawn at any time before performance or completion thereof.

Appeal from Randolph Circuit Court.—*Hon. A. H. Waller*, Judge.

AFFIRMED.

*R. S. Matthews & Son* and *Guthrie & Franklin* for appellants.

*Web M. Rubey, Ben R. Dysart* and *Dan R. Hughes* for respondent.

TRIMBLE, J.—The controversy herein is over an alleged balance claimed to be due from a bank to one of its depositors. While the relationship of depositor and bank existed, the latter turned over its cash, loans, and other assets to a new and succeeding bank upon condition that the succeeding bank would assume and pay off all sums due from the old bank to its respective depositors and other creditors. This action was, therefore, brought against the new bank, and afterwards the old bank was, by leave of court, made a party defendant and judgment was prayed against both. The suit was brought in Macon county by the depositor, Marcus H. Moore. On a change of venue the case was sent to Randolph circuit court. Thereafter, Moore died and the cause was duly revived in the name of his administrator, after which it was tried resulting in a judgment for plaintiff, and the defendants have brought the case here on appeal.

The old bank hereinabove referred to was the defendant, the Citizens Bank of Macon, which was engaged in a general banking business at Macon City on, and for many years prior to, August 27, 1907. On that day Marcus H. Moore, being then about to remove from Macon county and become a resident of Kentucky, took a number of notes aggregating something over $14000, to said bank and told the cashier, Lon Hayner, that he wanted to leave them with the bank for the collection of the interest thereon and also the principal thereof when that was proper, all of which were to be deposited, as collected, to Moore's credit in the bank. A list of these notes was thereupon made, showing the names of the makers, the dates, etc., and a receipt therefor was officially signed by said Hayner as

cashier of said bank. So far as the evidence shows this was Moore's first transaction with the bank, and from that time on he became a resident of Kentucky.

Thereafter, between September 19, 1907, and March 18, 1911, various collections were made on these notes at different times, each collection being deposited in said bank to Moore's credit.

On June 13, 1911, the Citizens Bank voluntarily went into the hands of the State Bank Examiner who took charge of it with all its assets. While affairs were in this situation the other defendant herein, the Macon County Bank, was organized by new and independent capital. It desired to succeed the old bank in its business and good will, and on the —— day of July, 1911, with the approval of the State Bank Examiner, said new bank entered into a written contract with the old bank whereby, according to plaintiff's contention, it assumed to pay all creditors of said old bank and is therefore liable for whatever balance is due from said old bank to plaintiff. As soon as this contract was executed between the two banks, the Examiner turned the assets of the old bank back to it for the purpose of transferring the same to the new bank. Thereupon the old bank turned over to the new bank all its assets including its banking house, furniture, and fixtures and everything connected therewith.

The evidence shows that the sums so collected on the Moore notes and deposited to his credit in the old bank, while it was running, amounted in the aggregate to $11,222.74; that during that time Moore received or got the benefit of $3217.34 made up of $1 paid for his benefit Oct. 22, 1908, $2400 lent on note of Gilbert Epperson (which note Moore got) and $816.34 cash paid to him August 19, 1909; that on the face of Moore's account with the old bank there was due him as a depositor a balance of $3005.40 at the time the contract between the two banks was signed and went into effect. This amount was entered to Moore's credit on the de-

posit account of the new bank and afterwards Moore checked out of it the sum of $2975. This sum, with the $3217.34 received by Moore from the old bank, made $6192.34 obtained by Moore in all, which, deducted from $11,222.74, left $5030.40 claimed by him to be due on November 6, 1911, when this suit was instituted. Of this amount, $30.40 was the difference between the deposit entered on the books of the new bank, $3005.40, and Moore's check thereon of $2975; and $5000 was the amount of a charge entered on the books of the old bank, for which no check was given by any one, and which Moore claims was not drawn with his authority nor for his benefit.

This $5000 item charged against Moore's deposit was entered in the handwriting of Lon Hayner the cashier, but bore no date. It was made somewhere between April 16, 1908, and June 5, 1908. As stated above, no check was given representing said $5000 charge, and, at the time it was entered, Moore's balance in the bank was $6927.69, which this charge reduced to $1927.69, and thereafter the balance, as shown on the books, fluctuated, being $1691.34 from April 3, 1909, to August 19, 1909, but thereafter it gradually rose to $3005.40 on May 13, 1911, and remained at that figure util the bank closed.

It is readily seen that the main controversy herein is over the validity of this $5000 charge. Moore claims that he did not know of it, never authorized it and never got any money or benefit therefrom either in notes or otherwise, and that as it has never been paid to him he is entitled to it and the remaining $30.40 of the deposit in the new bank.

Concerning this $5000 charge and what went with the money, the respective parties have different and conflicting theories and present evidence in support of their respective sides. On the part of the defendant it is claimed that sometime in 1907 or 1908, several years at least before the old bank failed, it was discovered

by the directory that the bank was in bad condition; that among other bad loans and overdrafts was an overdraft of one, Charles L. Pool, in the sum of $5000 which the directorate told Hayner must be cared for and taken up; that in order to do this Hayner and Pool executed their joint note to the bank for $5000 and with it squared the overdraft, and thus matters stood until about May 4, 1908. (Moore's balance then was nearly $7000). Defendants further claim, and their witness Hayner so testifies, that about that time he, having authority to make loans for Moore and to check on his account therefor, lent $5000 of Moore's money in this wise: He drew his own note for $3000 and took a $2000 note on Charles L. Pool dated February 20, 1907, payable to the bank and secured by a second deed of trust on Pool's residence, and with these two notes took up the $5000 Pool-Hayner note, and charged Moore's account with the $5000. He says he did this with Moore's consent and that Moore accepted the two notes and made no objection thereto. The $3000 Hayner note was originally payable to the bank, but Hayner says this was by mistake, it being inadvertently made on one of the bank's blank forms. He practically admits that he did not send the Pool note to Moore in Kentucky, but did send his own note for $3000 and wrote Moore that he made another loan for $2000 but did not tell him to whom. Moore laid aside the $3000 note and later on took it to Missouri and asked Hayner what he meant by sending him one of the bank's notes without having it endorsed to him. Hayner told him that was a mistake and tore up the old note and made a new one in its stead, payable to Moore, and delivered it to him. The Pool note of $2000 was never entered on the bank's books as a part of its assets, but Hayner says it was payable to the bank and was given as general collateral for whatever Pool owed therein. Hayner also says after he sent to Moore his $3000 note and the letter telling of

the other $2000 loan, he waited a little while for a reply, and then charged Moore's account with the $5000 item and took up the Pool-and-Hayner note. He admits that he got no reply from Moore in regard to it. He also admits that there was no action on the part of the board of directors authorizing him to transfer the Pool note to Moore.

In further support of the contention that Moore knew of and assented to the $3000 loan to Hayner and the $2000 loan on the Pool note, defendants offered evidence to show that there was a pass book of Moore's deposit account which corresponded to the ledger account and which disclosed that his account was balanced on August 12, 1909, and showed a balance of $1691.34, and that on August 14, two days later, Hayner gave Moore a statement of the notes remaining in the bank for collection, in which this balance was recited and in which the Pool note was listed; that Hayner showed the pass book to Moore and gave him the list of notes, and no objection thereto was made by him. Moore, however, denies ever seeing said pass book although after the bank failed a statement of the account was sent to Moore wherein a charge of $5000 is shown, it bears no date and does not show what it was for, not to whom it went. And although the list of notes given or sent to Moore on or about August 14, 1909, contained the Pool note, this did not inform Moore as to its status, because when Hayner wrote to Moore on April 3, 1909, he referred to the Pool note merely as "a note of $2000 on town property here."

Defendants also offered evidence to show that in June, 1911, after the bank failed, Moore appeared at Macon and, in company with his nephew by marriage, Judge Hopkins B. Shain of Sedalia, who was acting as his adviser, demanded possession of several notes and among them the Pool note; that both Shain and Moore admitted the loan of $3000 to Hayner and claimed the Pool note and conceded that the two notes fully ex-

plained the $5000 charge in Moore's deposit account; that after the new bank was organized, Moore and Shain again came to Macon in August, 1909, and demanded the Pool note of the new bank and also of the officers of the old bank. The new bank had possession of the Pool note but held it, not as assets of the old bank, but separately along with other notes the ownership of which was in dispute; that pursuant to Moore's and Shain's demand on the president of the old bank for the Pool note, it was agreed that the president should call the old board together and pass an order turning over to Moore the Pool note along with two other notes, one on Wood and another on Epperson; that this order was made on September 27, 1911, and on October 3, 1911, the three notes were tendered Moore's attorney, Web M. Ruby who, in behalf of Moore, accepted the Wood and Epperson notes but declined to take the Pool note; that on August 1, 1911, when the new bank opened, Moore's pass book in the old bank was again balanced showing, according to its face, a balance due Moore of $3005.40 which was placed to his credit on the books of the new bank; that Moore, with knowledge of all these things drew $2975, or all but $30.40, out of the new bank after which he brought suit for the balance claimed by him. The defendants, therefore, insist that the note of $3000 on Hayner and the $2000 Pool note should be considered as part payments of Moore's account.

On plaintiff's part it is contended that Hayner used the $5000 to cover Pool's overdraft of that amount and did so without authority from Moore; that the assignment by Hayner of the Pool note to Moore was void and passed no title to Moore because it was an attempted assignment of the bank's assets without a resolution of the Board of Directors to authorize it as required by section 1112, Revised Statutes 1909.

Upon hearing the evidence, the trial court held that Moore, by bringing the $3000 Hayner note, pay-

able to the bank, back to him and receiving in lieu thereof a similar note for $3000 payable to Moore, thereby authorized or ratified a loan of that amount to Hayner, and, therefore, Moore's account should be credited with that note. The court refused, however, to credit the account with the Pool note and rendered judgment for $2297.39, this amount being made up of the $2000, with interest from date of suit, plus the $30.40 balance due on the deposit as it appeared on the books.

Plaintiff did not appeal from that part of the judgment crediting the account with the Hayner note. So that, the $30.40 balance shown on the books having been admitted to be due on the trial, the contest now narrows down to the question whether or not Moore's account should also be credited with the Pool note.

Before entering upon a discussion of the various points raised, it may be well to observe that the evidence undoubtedly establishes two things, first, that there was a deposit of Moore's money in the Citizens Bank, second, that at least $2000 of that deposit was taken out and used for the benefit of said bank. This is true whether Hayner first made a $5000 note jointly with Pool to cover the latter's overdraft and then took up said joint note by taking $5000 out of Moore's account and substituting in lieu thereof his own note for $3000 and Pool's note to the bank for $2000, or whether he directly cancelled Pool's $5000 overdraft with a charge of that amount against Moore's deposit. In either case the ultimate result was the using of $5000 of Moore's money to reduce an overdraft of that amount in the bank. Now, when Hayner sought to give Moore something in exchange for $2000 of that amount he did so by assigning to him a note which he had no authority to assign, and under the statute his act was utterly void and passed no title to Moore. [Sec. 1112, R. S. Mo. 1909; Long v. Long, 167 Mo. App. 79; Third Nat'l Bank v. St. Charles Sav. Bank, 244 Mo. 554; Vansant v. Hobbs, 84 Mo. App. 628.] Consequently,

Moore has never received anything in exchange for the $2000. Even if Moore did know, from the second list of notes given him, that a note of $2000 on Pool was among them, yet as he knew nothing of the facts concerning that note which, if known, would have disclosed that he had no title thereto, this would not debar him from demanding his money in lieu of such a note, nor would the fact that, while in ignorance of the true situation as to his title to said note, he demanded that it should be turned over to him.

Consequently, so far as the liability of the old bank is concerned, the evidence shows that Moore had a deposit therein and that $2000 thereof had never been paid to him, and, therefore, judgment should go against it. As to the liability of the new bank, that depends upon whether or not it obtained the assets of the old bank and contracted to pay the debts and obligations of the old bank.

The first point raised by defendants is that their objection to the introduction of any evidence under the petition should have been sustained. The petition is alleged to be defective in that it contains no allegation that the contract between the two banks was performed or that the new bank accepted performance thereof. The petition, after alleging facts showing that Moore was a depositor in the old bank and had not received the portion of his deposit sued for, alleged that the old bank thereafter ceased business and for a valuable consideration sold and transferred all its assets and property of every kind whatever to the new bank in consideration of which the latter bound itself to pay all deposits and other debts and liabilities of the old bank and entered into a written contract to that effect. The reasonable intendment and fair implication borne by the petition is that at least one of the moving causes and purposes of the transfer from the old bank to the new was the protection of the depositors and creditors of the old bank; that such transfer was accomplished,

and that in consideration thereof the new bank agreed, in writing, to pay all the debts of the old. Even if this case cannot be considered one where, under the contract between the two banks, assets have come into the hands of the new bank which in equity belong to the plaintiff, because the petition does not seek to follow the assets and, therefore, does not rely upon the implied undertaking which the law raises from the possession of such assets, but relies upon the written contract to pay, still the petition does not wholly fail to state any cause of action whatever. It shows that the old bank turned over its assets to the new upon condition that the latter would take care of the former's depositors and creditors, and that the new bank contracted in writing to do so. The implication arising from that state of facts is that the transfer was made, that the new bank accepted performance of the terms of the contract, and that plaintiff was among those for whose benefit the contract was made. This would authorize the maintenance of a suit in Moore's name or in the name of his administrator for the benefit of his estate. As the petition did not wholly fail to state a cause of action, it is not vulnerable to attack by a mere objection to the introduction of testimony, at least where that objection has been overruled and the cause has proceeded to judgment in favor of the plaintiff. [Applegate v. Quincy etc. R. Co., 252 Mo. 173, l. c. 183; Ice and Coal Co. v. Kuhlmann, 238 Mo. 685, l. c. 702.] No demurrer to the petition was presented, and even though the allegations of the petition as to the transfer of assets and the agreement to pay debts be considered as somewhat in the nature of legal conclusions, still this does not constitute such a failure to state any cause of action whatever as would justify us in holding that reversible error was committed in overruling an objection to any evidence under the petition.

It is next insisted that the claim for which plaintiff sues is not within the scope and meaning of the

contract; that the contract was limited to the payment of the debts mentioned in a certain schedule attached thereto, and, as the claim sued for was not in that schedule, the new bank is not liable therefor. In answer to this it may be stated, at the outset, that the contract nowhere says the new bank will pay so much and no more. There is no limit expressly placed on the amount of debts of the old bank which will be paid by the new. The contract says the first party (the old bank) "is desirous of turning over all of its said cash, loans and other assets, upon condition that second party will assume and pay off all sums due from said first party to its respective depositors and other creditors" and that the second party "is desirous of obtaining the business and good will of said first party, and *is willing to assume the payment of all sums* due from first party to its depositors and creditors, provided suitable arrangements can be made therefor satisfactory to the banking department of Missouri;" that therefore the second party "hereby agrees to and does assume full payment of all sums due from first party to its depositors . . . as fully as the same is set forth in . . . Exhibit A. attached hereto . . . *In addition to paying said deposits said second party assumes and agrees to pay all other creditors of said first party existing at the time of the execution and delivery of this agreement.*" And first party agreed "to turn over and deliver to said second party all of the cash which it has on hands or to which it may be in anywise entitled" . . . and "by proper assignment duly executed, to deliver to said second party all of its bills receivable together with all collateral securities of the same" . . . and to "assign and deliver all the remaining assets of whatever kind and character including good will and leasehold on banking house." The eighth paragraph of said contract recites that "first party simultaneously with the execution of

this agreement has caused certain of its directors to deposit with the second party, as a cash indemnity to said second party, the sum of $10,000 to *indemnify* said second party against *all loss* that may be sustained by it *in the payment and discharge of the deposits and liabilities of the first party"* . . . "and after *all* such deposits *and liabilities* of the first party have been *discharged by said second party"* the remainder of said indemnity fund is to be returned to the contributors thereof. The ninth paragraph provided for the simultaneous giving by the old bank of a bond "conditioned that if the money, notes and assets of the first party herein assigned and turned over by it to second party be insufficient to pay off and discharge all of the obligations of the first party so assumed by second party . . . then first party and its said securities shall jointly and severally make good to second party any shortage or deficiency of said assets to fully pay off and discharge the same." In other provisions of the contract, not quoted, the new bank agreed to collect and convert into cash all loans and assets of the old bank as fast as possible, to take out "sufficient moneys to fully reimburse it for *all moneys paid out by it to the depositors and creditors of first party"* together with $5000 for doing the work and the necessary expenses incurred thereby, and then to turn the remainder of said assets over to the old bank or account therefor in a settlement therewith. From the terms of the contract alone, without regard to the situation and character of the parties thereto, it would seem plain that the new bank in consideration of the turning over to it of the old bank's assets, and a fee of $5000 together with the benefit to be derived from handling the business, agreed to liquidate the business of the old bank, collect its assets, *pay all its debts,* and, if any surplus remained, to turn it back to the old bank; and that to indemnify the new bank against loss in paying all debts of the old, a $10,000 indemnity fund

was placed in its hands, and to make assurance doubly sure in that regard, a bond was given as an additional security. This construction of the contract is confirmed when we consider the character and situation of the parties. They were two banks. The old bank was about to go out of business. Its primal duty under the law was to see that its creditors were protected and that due provision was made for the payment of all its debts. This duty of paying creditors was an imperative requirement demanded by the law, and any other construction placed on the contract would render the transaction illegal, at least, as to creditors. When the contract is viewed in this light together with its plain and unmistakable terms, we do not think its evident purpose and intention should be destroyed merely because of a statement in the seventh paragraph that the new bank's agreements are based on the fact that the old bank's net assets are as shown on its books. Even if such clause can be considered to mean what defendants claim it does, it should not be allowed to override and break down the plain intendment of all the other terms of the contract especially when to give it such construction would destroy the contract as a valid instrument, at least so far as creditors are concerned. Nor should the scope and meaning of the contract be limited, controlled, or determined by any construction which places special and unnatural emphasis on the words "other creditors." "No word or phrase should control the terms of a written contract when the whole instrument shows such was not the intention of the parties." [Carney v. Chillicothe Water and Light Company, 76 Mo. App. 532, l. c. 536.]

Point is made that the contract is executory only and that there was no proof that the $10,000 indemnity fund and the indemnity bond was ever put up with the new bank. The contract, however, acknowledges that the $10,000 has been put up and provides for delivery of the bond simultaneously with the execution of the

contract. So far as plaintiff rights are concerned the contract became executed when the assets of the old bank were turned over to the new and the latter assumed the burden of liquidating the affairs of the old. The requirement of the bond as additional security could have been waived by the new bank, and if it was not waived and the bond was not put up, it would seem that such fact would have been set up in the new bank's answer.

The contract, therefore, was not a limited contract. The new bank for a valuable consideration assumed to pay all sums due from the old bank to its depositors and creditors, and this comprehensive assumption included the Moore claim. The new bank, by such contract, became the principal debtor and the old bank became the surety for the new. [Nelson v. Brown, 140 Mo. 580.]

It is also urged that Moore by drawing out $2975 from the new bank thereby debarred himself from afterwards questioning the balance due him on the face of the books since that was an agreement on his part that the amount thereby disclosed was correct. But Moore says that at the time he drew the check he did not know the new bank had agreed to pay the debts of the old. The contract moreover provides that the new bank shall pay all deposits, except time deposits, upon application by the depositor. Nothing is said therein to indicate that such payment would be in full of all claims by such depositor against the bank, nor was anything of the kind said or intimated by the new bank to Moore at the time he cashed his check. Consequently, his drawing that amount cannot be held to conclude his rights herein. [Hawthorn Lumber Co. v. Lee Jordan Lumber Co., 167 Mo. App. 201; Rogers v. Union Iron etc. Co., 167 Mo. App. 228; Pollman v. City of St. Louis, 145 Mo. 651; Publisher, Geo. Knapp & Co. v. Pepsin Syrup Co., 137 Mo. App. 472.] We do not agree with defendants that Moore is confined to

the book balance as upon an account stated. According to Moore he never saw his pass book; and in the list of notes given him by Hayner which contains the Pool note, there is nothing to disclose to Moore that he has no title thereto. So far as disclosed to him, everything was regular and legal. And the way the entries were made, the fact that the Pool note was not sent to Moore but kept at the bank and was not specifically referred to in the letters to Moore, show that care was taken to keep from Moore the true situation as to that note. Consequently, his failure to repudiate the Pool note upon receiving the second list ought not to debar him from his rights. And the fact that while laboring under the belief that he had title to the Pool note he demanded it should be turned over to him, does not destroy his right to recover the money which was wrongfully exchanged for that note, especially when said exchange gave him no title thereto. His prior demand of the note would not prevent him from looking to the new bank since there is no evidence anywhere that it was led to change its position on account of such demand.

It is further insisted that the Pool note is not within the meaning of section 1112 and that, under the circumstances of this case, Hayner the cashier, while the agent of the bank was also the agent of Moore, so that his transfer of the Pool note, coupled with Moore's acceptance thereof and acquiescence in such transfer, is binding upon Moore and cannot now be questioned by him or his personal representative. The claim that the note does not come within the purview of the statute rests, as we gather from defendants' brief, upon two things: First, that the note was not in reality an asset of the bank, that, it was not a "note or other obligation received by said corporation for money loaned" as specified by the statute, but was only a general collateral security note not entered on the books of the bank; second, that the $2000 was received and

used by the bank for the very purpose the collateral note was given, namely, the payment of Pool's debts to the bank, and for these reasons section 1112 was not violated in assigning the note. These premises being assumed, it is then asserted that Hayner was acting individually as the agent of Moore, and consequently he is bound, by his agent's acts and his own acquiescence therein, to accept the note.

With regard to the question whether this Pool note was an asset of the bank, it is well to observe that it was payable to the bank, that it was dated February 20, 1907, some six months before Moore had any dealings with the bank; that it has endorsed on it interest credits of $120 each for three consecutive years, the last one being up to September 20, 1910, long after the $5000 charge was made, but no one of which interest credits went to Moore's deposit account. In addition to this the old bank in its answer alleged that said note was "originally given by the said Pool to this defendant for money loaned the said Pool out of its said moneys, and which note was in the bank of this defendant at the time it closed its business." This answer is, therefore, inconsistent with the claim that the note was not an asset of the old bank, but as the new bank cannot be bound by the answer of the old one, but is entitled to stand upon what the evidence shows, this discrepancy may be immaterial as to it. The character of the note therefore, should doubtless be determined from the evidence rather from an admission in the answer of another defendant. Accepting the note then as a collateral security for Pool's debts to the bank, it does not follow that it is outside of the purview of the statute. Because it was given as collateral does not make it any the less an asset of the bank. Indeed, since it was secured by a deed of trust it may, at the time it was assigned, have been more valuable than the note or debt for which it was collateral. When received, it attached to and became security for any in-

debtedness the maker owed the bank. Hence it was given "for money loaned." But, if it does not come within such a description, it is nevertheless within the meaning of the statute. That statute was enacted to prevent bank employees from selling or pledging any of the bank's assets without an order of the board of directors. The statute says "*all acts* of indorsing, selling, pledging and hypothecating done by said cashier, or other officer or employee of said bank, without the authority from the board of directors, *shall be null and void.*"

With regard to the other branch of the point now under consideration, namely, that Hayner was Moore's agent, it should be observed that the evidence abundantly supports plaintiff's claim that the notes were not left with Hayner individually but with the Citizens Bank. Moore, in a deposition taken prior to his death, swore he left the notes with the bank. The first receipt given to Moore August 27, 1907, and attached to the list of notes, says "This is a list of notes left *with the Citizens Bank* for safe keeping and for collection of interest or principal and amounts so collected to be deposited to credit of M. H. Moore." And the second list of notes given on or after August 14, 1909, is headed "Notes of M. H. Moore *Left with Citizens Bank.*" Hayner refused to swear that they were left with him individually and afterward practically admitted they were left with the bank. If they were so left, then Hayner's attempt afterwards to change the character of the transaction by taking the notes and pass book to his house when the bank closed would amount to nothing. Nor was the work of collecting the interest and principal of the notes and the reloaning thereof on good real estate security, when a loan of that character was obtainable, such an opposition to the general business of the bank itself as to create a dual agency in Hayner. The agreement between the bank and Moore was that the money should be deposited in the bank to

Moore's credit; that it could be reloaned as a first lien on good real estate security or left in the bank subject to Moore's check. If not loaned and Moore did not see fit to draw it out, the bank agreed to pay a, small rate of interest on it. Neither Moore's letters nor those written by his wife conceding the latter are admissible (upon which, however, we express no opinion), do not create a dual agency or change the relations existing between Moore and the bank or between Moore and Hayner. There is no necessary inconsistency between these letters and the status disclosed by the receipts attached to the list of notes or between them and Moore's explanation thereof. If Hayner was told therein to "use his best judgment" it was as to whether the money should be lent on first real estate loans or left in the bank, either of which, Moore had been told, in a letter, could be done. If in other of these letters, matters were left for Hayner to decide, it was clearly as to the computation of interest due, and in no way gave Hayner authority to appropriate Moore's money in any way he saw fit, nor did they ask of Hayner to do anything incompatible with the latter's duties to the bank. In fact, as all of Moore's transactions with the bank were done with and through its cashier Hayner, these letters to Hayner could be interpreted as letters to the bank through its cashier, at least they are not required to be interpreted otherwise unless they clearly and explicitly so show, which they do not.

The point that, if the Pool note is within the statute, then Moore is *in pari delicto,* in the attempted transfer thereof to him and should therefore be left in the situation in which he has brought himself, is without merit. Moore while he held the list containing the Pool note, did not know what it was, nor where it came from. These things were carefully concealed from him. If Moore had gone in with Hayner in an attempt to defraud the bank by having one of its notes trans-

ferred to him without authority, and then, upon find-
ing that the note was worthless, had sought to recover
what he had paid therefor, equity might leave him
where he was. But the case at bar is not that case nor
anything similar thereto.

It is also said that the contract between the two
banks, if construed to mean that the new agreed to pay
all debts of the old, is *ultra vires* and for that reason,
plaintiff ought not to recover against the new bank.
*Ultra vires,* however, was not pleaded. This must be
done if it is to constitute a defense. [Richard Hanlon
Millinery Co. v. Mississippi Valley Trust Co., 251 Mo.
553.] But if it had been, could that defense prevail in
this case? We do not think so. It is undeniable that
by means of the contract the new bank got possession
of all the old bank's assets and property and agreed
to pay all its debts. The contract was for the benefit
*primarily* of the creditors of the old bank and second-
arily for the benefit of both banks, and both. banks
knew this and intended it to be so. To make sure of its
safety in the matter, the new bank took charge of a
$10,000 indemnity fund and also required an indemnity
bond. The new bank, having received from the old
bank all of its assets, (whereby the.latter is rendered
powerless to pay its debt to plaintiff), and holding on
to all the benefits derivable from the contract, ought
not, in equity and good conscience, to be allowed to
escape performing the obligations thereof especially
toward one for whose benefit the contract was made
and who had nothing whatever to do in the way of
bringing about said contract or rendering it necessary.
A corporation, even a bank, cannot receive money to
do a thing and fail to do it, and after keeping the
money, excuse itself from liability on the ground of
*ultra vires.* [Richard Hanlon Millinery Co. v. Mis-
sissippi Valley Trust Co., supra, l. c. 579; Third Nat'l
Bk. of St. Louis v. St. Charles Savgs. Bk., 244 Mo.
554, l. c. 581, 582; Union Nat'l Bank v. Lyons, 220 Mo.

538, l. c. 579.] Certainly this is true to the extent of the money and property received from the old bank, and there was no evidence, nor offer to prove, that it is insufficient for that purpose. It might also be remarked that since Moore had nothing to do with creating the contract or rendering it necessary, he cannot be considered as *particeps criminis* even if the contract is *ultra vires* as between the two banks, about which last we express no opinion. He does not stand exactly in the shoes of the old bank when he looks to the new for the payment of his debt. So far at least as the transfer of the assets and property of the old bank is concerned—by the possession of which only it could pay plaintiff—the contract was executed, and it is not strictly and solely on the agreement of the new bank to pay debts that plaintiff's rights depend. They arise out of the fact that the new bank received property from the old and in addition thereto holds still other funds created for plaintiff's benefit and for the payment of his debt.

It is also claimed that a new contract was entered into between the old bank and Moore by which the latter was to get the Pool note. This is claimed upon the ground that Moore and his nephew, Judge Shain, demanded the Pool note, along with others, of the president of the old bank and that the president agreed, as soon as he recovered, he would call the board together and turn the notes over, and that pursuant to that agreement the old board authorized that to be done. But Judge Shain's evidence is emphatically that his demand was an offer of compromise and that nothing was done at the time in the way of definitely accepting the offer. And the evidence clearly shows that when the old board was called together it did nothing and learned at that time that Moore's offer of compromise was no longer in effect. And it was not till the following September that the board made the order to turn over the Pool note together with two others which did

in fact belong to Moore and were never the bank's property. In addition to Judge Shain's testimony that there was no definite acceptance of his offer of compromise, the testimony of Otho Matthews, a son of the president of the old bank, shows that the offer was not accepted, but that the president told Judge Shain "that he had no authority whatever to turn over the assets of the bank to them, that he couldn't do it, unless he was thoroughly satisfied that Moore was the owner of those notes, and that *it would take an investigation,* but that as soon as he could get out *he would investigate the matter,* and that *if* Moore was entitled to them he would call the board together, and that *if* they thought it was to the best interests of the depositors and stockholders he would then turn the notes over." This was clearly not an unconditional agreement to turn over the note or to accept the offer of compromise. And, thereafter, before anything further was done, the offer of compromise was withdrawn. It is true a formal tender of three notes, including the Pool note, was made to Mr. Rubey, Moore's attorney, but the tender nowhere stated that it was made pursuant to a compromise or that all of the notes must be taken or none. In fact, it would seem that this last was not intended as a condition of the tender, since the directors of the old bank, in making the tender, allowed Rubey to take two of the notes while expressly rejecting the third or Pool note.

No error was committed in including in the judgment the $30.40 tendered during the trial. It was of course tendered as a settlement in full of the amount due plaintiff. He was, therefore, compelled to refuse the tender. No interest was calculated on this $30.40 so that its inclusion in the judgment is not erroneous. Plaintiff was still entitled to receive this $30.40 in addition to the $2000 with interest from date of suit. The tender only affected the costs in case the plaintiff did

not recover more than that amount. [Sec. 2282, R. S. Mo. 1909.]

We have carefully gone over the entire case and examined every point raised in the exceedingly able and exhaustive brief filed in behalf of the defendants. Being of the opinion, however, that neither of them is entitled to have the judgment disturbed, it is accordingly affirmed. *Johnson, J.,* concurs, *Ellison, P. J.,* dissents.