CITIZENS STATE BANK, a Corporation, *et al.*, v. R. H. ADAMS, *et al.*

193 So. 281
Division B.
Opinion Filed July 28, 1939
On Rehearing January 23, 1940

*John H. Carter & John H. Carter, Jr.,* for Appellants;
*James H. Finch* and *B. L. Solomon,* for Appellees.

PER CURIAM.—The record in this case shows that the Citizens State Bank for many years past has conducted a general banking business at Marianna, Florida. It was capitalized at $30,000.00, and during the year 1925, or 1926, the State Comptroller raised the question of its solvency and called a meeting of the directors and insisted that its capital structure be repaired. He considered an assessment against the stockholders, and E. N. Horne, D. A. McKinnon, R. H. Adams, W. S. Brandon, and L. G. Phillips, stockholders and directors of the bank, paid into the bank the aggregate sum of $6,000.00. An assessment against the remaining stockholders of the bank was never made by the State Comptroller.

The Citizens State Bank, incidental to its banking activities, became the owner of certain property described in the record as Campbellton Gin & Mill property, hereinafter referred to as the farm, and carried it upon the books of the bank at the sum of $30,000.00. Mr. J. A. Ormond, cashier of the bank, originated the idea of forming a corporation on the part of the stockholders and directors paying the voluntary assessments on their stock into the bank in the aggregate sum of $6,000.00, and pursuant to the suggestion the Citizens Investment Company came into existence with a paid in capital stock in the sum of $6,000.00. A bond for title was given by the bank to the investment company, when the investment company executed and delivered to the bank its four notes in the total sum of $24,000.00.

The first year or two the operation of the farm resulted in a net earning of the farm in approximately the sum of $12,000.00, one-half of which went to the Investment Company and was paid on the notes with the bank. Some of the buildings on the farm were destroyed by fire and the insurance collected was placed on the notes at the bank.

From time to time other payments were made, which reduced the balance due on the notes on December 6, 1929, in the sum of $10,025.00. The title to the farm at all times remained in the bank. The payments to the bank from time to time on the notes, directly or indirectly, came out of the farm as the stockholders of the investment company did not pay its money on the said notes. On August 21, 1937, the bank sold to Grady Adams the farm for the sum of $5,075.00. The Investment Company had been dissolved by a proclamation of the Governor because of its failure to pay certain taxes as provided by law.

Mr. J. A. Ormond became identified with the bank during the year 1912, and was in name cashier of the bank, but in truth he exercised more power or authority in the management of the bank than is usually conferred upon a cashier, and in addition thereto he was an executive manager of the bank. He owned considerable stock in the bank and desired to retire from the banking business, and Hon. Ernest Amos, then State Comptroller, so advised Mr. W. H. Nobles, then residing at St. Augustine, Florida, and who had in the past been engaged in the banking business in Florida.

Mr. W. H. Nobles testified that prior to the purchase of 152 shares of stock of the bank for the sum of $15,200.00, he was advised that the capital structure of the bank was impaired and that the State Comptroller was threatening an assessment against the stockholders for the purpose of replenishing its capital, and under this condition directors R. H. Adams, L. G. Phillips, J. A. Ormond, D. A. McKinnon, and W. S. Brandon, acknowledged their respective liability as stockholders of the bank under the law and agreed to surrender their stock, and did so surrender it voluntarily so as to escape a possible assessment by the State Comp-

troller, and also by so surrendering it the bank would not close but continue to function, and the same would not be closed under an order of the Comptroller.

The plaintiffs below testified that the directors above named, on December 6, 1929, received from W. H. Nobles the sum of $15,200.00 and that the same was left in the bank by them as part of its assets, and simultaneously notes approximating $15,200.00 in value were taken out of the bank's assets and delivered to the directors, *supra,* as compensation for their stock. They contended the bank was sovlent. Nobles contended the $15,200.00 in notes was not bankable but slow and he desired that they be taken from the assets of the bank or not reported to the Comptroller in the semi-annual report, but the ownership thereof was to remain in the bank. The directors, or Mr. Ormond, representing the directors, denied this, and contended that the same became the property of the directors and when his services with the bank ended in 1932, he took out of the bank certain notes and claimed them as the property of the directors. One of the notes in the sum of $5,525.00 was reported to the State Comptroller as the property of the bank and with a knowledge thereof on the part of Ormond. Nobles retained the physical possession of the note for the sum of $5,525.00.

A suit was filed by the Investment Company, R. H. Adams, and L. G. Phillips against the bank and Grady Adams, who is in possession of the farm, and other stockholders of the Investment Company. It was alleged that the bank had received full payment for the purchase price of the farm and no longer held in equity any right or title thereto, when the directors took from the bank the sum of $15,200.00 of undesirable or slow notes, which included the balance due on two notes given by the Investment

Company to the bank, one for $4,500.00 and one for $5,525.00, at the time the Investment Company took a bond for title from the bank to the farm. The title to the farm followed the notes.

The prayer of the bill is to have declared an equitable lien on the property of the Investment Company, consisting of the notes claimed to have been transferred by the bank to Ormond, and that the Investment Company be subrogated to the obligation of Adams for the purchase price of the farm and that the Investment Company be subrogated to the position of the bank with reference to the notes claimed to have been delivered by the bank to the Investment Company.

From a final decree for the plaintiffs below an appeal has been perfected to this Court and the same is assigned as error. Counsel for the respective parties have propounded a number of questions to be decided by this Court but contend that the question here is whether the stockholders made a gift of the 152 shares of stock to the bank, or did they exchange it for the $15,200.00 of objectionable or slow assets in the bank of December 6, 1929, when the trade was closed. The trade between Nobles and the bank was not reduced to writing and Ormond was the only officer of the bank present when the trade was closed.

It is fundamental that the cashier and his associates forming the pool making up the 152 shares of stock had a right under the law to deliver the stock to the bank and to permit or allow the money arising from the sale thereof to Mr. Nobles to be paid into the bank and there to remain or be used for the purpose of repairing the capital structure of the bank. This right existed regardless of whether or not either of them thought or had good reasons to believe that if the bank closed they would not only suffer a loss of

the amount of the stock held by each of them, but be subjected to additional assessments by the Comptroller, if in his judgment it became necessary. The alleged transfer by the cashier on December 6, 1929, of the $15,200.00 of "slow" assets of the bank to the cashier and his associates presents here a very serious question.

The State grants charters to groups desiring to engage in the banking business and because of its public relations prescribed their regulation. It is commonly recognized that the banks are the agencies through which trade, industry and commerce of a country are transacted. It is of tremendous importance to the general public, that banks and their officers conduct their business at all times within the law as prescribed by the Legislature. This Court has held that offcers of a bank, because of their fiduciary character, are required to act with the utmost good faith, and they are forbidden to deal with or handle the funds or property of the bank for their own advantage. See Luria v. Bank of Coral Gables, 106 Fla. 175, 142 So. 901; Chipola Valley Realty Co. v. Griffin, 94 Fla. 1151, 142 So. 901; Jacksonville Cigar Co. v. Dozier, 53 Fla. 1059, 43 So. 523.

It is clear on the record that at the time the cashier delivered the 152 shares of stock for himself and associates and left the money with the bank, he was the only person to act for or in behalf of the bank, and continued to be cashier from December 6, 1929, until sometime during the year 1932 and Mr. Nobles became a stockholder, when he paid to the cashier the sum of $15,200.00. It was then his desire that the $15,200.00 in slow assets be charged off but should remain the property of the bank, but the cashier claims that these assets passed to him and his associates in exchange for their stock. From a study of this record, the briefs, and authorities cited, and after hearing oral

argument at the bar of this Court, it seems to us that a decision of this case must turn on the point of whether or not the cashier, or an executive officer of this bank, had the authority under the law to dispose of or sell assets of the bank to the potential value of $15,200.00, being more than one-half of the capital stock of the bank.

· It is a general rule that a director of a corporation occupies a fiduciary relation to the corporation and that he will not be allowed in equity to act in hostility to it, by assigning for his own benefit a lease of the premises occupied by the corporation in carrying out its business, but will be treated as a trustee of a lease thus acquired for the benefit of the corporation. See Jacksonville Cigar Co. v. Dozier, 53 Fla. 1059, 43 So. 523. In the case at bar Mr. Ormond was cashier for the bank and was financially interested in and trustee for his associates in selling the stock in the bank and getting from the bank for himself and associates the slow assets to the potential value of $15,200.00.

The authority of a cashier of a bank is set forth in the following works on the subject, viz.:

7 Corpus Juris, pages 556-557: "On the other hand it has been held that a cashier has no authority to sell or to encumber the bank's property even to pay a debt, especially the real estate; to exercise a power of sale on default where the title is conveyed by a deed to secure a debt in the bank; to assign collaterals, even though they belong to himself, if they are pledged to the bank for the benefit of another; to transfer notes outside the ordinary course of business; to assign to a depositor, in payment of his deposit, notes that have been discounted; to assign the assets of the bank without authority from the board of directors; to assign the assets of the bank for the benefit of a part of the creditors to the exclusion of others; to transfer judgments in the

bank's favor; to lease the property of the bank; to accept the surrender of a leasehold term; to lease premises of others for the bank; to pledge a bank's assets for the payment of an individual, or for an antecedent debt; to agree that a lessee of the bank may use the leased premises for a purpose prohibited by the lease; to guarantee the note of a third person; * * *."

3 Ruling Case Law, page 448, par. 75: "75. Power to Release Debtors.—A cashier has no implied power merely by virtue of his office, to give away, surrender, or release the bank's securities. He can do no act which so operates. When he does this he is outside the scope of his authority, and is acting not according to usage, practice, or usual course of business, but in plain disregard of the rights of the bank. Unless specially empowered to do so, he is not authorized to release, otherwise than in due course of business and on payment, the makers of notes or other debtors of the bank, or to release sureties or indorser. * * *"

9 Corpus Juris Secundum, page 458: "However, a cashier cannot, of course, do anything which is not within the inherent power of his office and which he has not been expressly or impliedly authorized to do, and consequently it has been held that he has no power to make loans, borrow money for the bank, or sell or encumber the bank's property even to pay a debt, especially the real estate; to sell, or assign collaterals, even though they belong to himself, if they are pledged to the bank for the benefit of another; to transfer notes outside the ordinary course of business; to deliver notes of a partner, charged against the firm funds, to a copartner; to use notes to buy a commercial enterprise when the bank is forbidden by statute to engage in trade or own or operate such an enterprise; to assign to a depositor, in payment of his deposit, notes that have been

discounted; to assign the assets of the bank without authority from the board of directors; to assign the assets of the bank for the benefit of a part of the creditors to the exclusion of others; * * *."

7 American Jurisprudence, page 189, par. 254: "It is a well-settled principle of law that the cashier cannot bind the bank by his acts in respect of matters in which he is personally or adversely interested, and third persons are bound to know that the cashier has no authority to use the funds of the bank for his own benefit. Accordingly, when he is indebted to the bank, he cannot act for himself as debtor and for the bank as its managing agent and in such double capacity agree that another debtor to the bank shall be substituted in place of himself. Nor has the cashier the implied power, as such, to draw check or drafts in his own favor or in payment of his own debts, to bind the bank by the certification of his personal check upon the bank, or to pay his individual debts by entering the amount of them as a credit upon the passbook of his creditor, who kept an account with the bank, and permitting the latter to exhaust such account by checks which were paid, the bank having received nothing of value in the transaction."

Page 210, par. 288: "A cashier of a bank is bound to act in good faith and with ordinary and reasonable skill, care, and diligence in the discharge of his duties. If he fails to act with such skill, omits such care and diligence, or acts in bad faith, and the bank suffers damage as a consequence, he is liable. However, it is not necessarily negligent, in the absence of a by-law or an order of a superior officer, for the cashier to pay the overdraft of a responsible customer; this is a common practice in banking business. If intrusted with the duty of making loans, the cashier is not responsible as a guarantor of the solvency of the persons to whom loans

are made or for an error of judgment, where he has exercised reasonable skill, diligence, and prudence. However, a resolution of the board of directors intrusting the lending of money and discounting of paper to the discretion of the cashier does not authorize him to lend to himself. He cannot represent himself and the bank at the same time, and his conduct in so doing is a clear breach of duty upon his part."

See Miles v. Macon County Bank, 187 Mo. App. 230, 173 S. W. 713; Sims v. Athens Bank, 139 La. 324, 71 So. 525.

Vol. 4, Zollman on Banks and Banking, pages 269-270, Sec. 2240 (and cases cited): "The rule that the president of a corporation has no *ex officio* power to sell or mortgage the corporate property applies to bank presidents, and such officers have no right to pledge the assets of the bank, particularly to secure an antecedent or questionable debt.

"The same rule applies to the cashier, who accordingly must show specific authority for such action, though he may have inherent power to pledge collaterals to secure a note duly given by the bank at the time of such pledge.

"The pledge of the bank assets to secure debts of the bank is not an ordinary or daily occurrence. When such action becomes necessary, with the exception of a pledge of bank assets to secure public deposits, it is of sufficient moment to justify the calling of a special meeting of the board of directors. Their authorization need not, however, necessarily be by formal resolution. It must, of course, be the bank's debt which is thus secured and not the personal debt of the cashier."

If we agree to the conclusion of fact as asserted by counsel for appellees, viz: that the bank was solvent on December 6, 1929, at the time of the alleged sale and delivery of the assets of the bank of the potential value of $15,200.00 it

then becomes necessary to overlook some very stubborn facts: (a) the cashier and his associates not only permitted but allowed and consented that the $15,200.00 arising from the sale of their stock to remain as part of the assets of the bank; (b) the cashier paid into the bank, as shown by his testimony from his salary over the years large sums of money; (c) there was no effort, from 1925 to 1929, made by the directors to recover the voluntary assessment by them paid into the bank; (d) the bank would have returned to certain named directors $6,000.00 so paid had it been solvent; (e) if the bank had been solvent, no stock assessments could have been made and the stock could have been sold at par and the money paid to the owner thereof rather than permit the $15,200.00 to be placed as assets of the bank. These facts, as shown by the testimony, creates or establishes a strong presumption that the bank was experiencing financial difficulties in December, 1929.

It is suggested that the banking laws of Florida are identical with the national banking laws and the construction or interpretation placed thereon by the Federal courts should be binding on the Supreme Court of Florida. Many cases are cited to sustain the view that the cashier had authority under the law to sell and transfer the assets of the bank of the potential value of $15,200.00, while the cashier himself and associate directors supplied the 152 shares of stock sold to Mr. Nobles. It is true that many of the cited cases sustain acts and doings of a cashier in compromising debts, an oral agreement on the part of the cashier to repay money borrowed, for the bank to secure payment of indebtedness due the bank, it cannot be questioned that a cashier within the inherent power of his office can do and has authority to do all those things within the scope of employment as cashier and all things for the ordinary business transactions

of the bank, as contended for by counsel for appellees, but to sell or dispose of property of the bank to himself and associates of the potential value of half of the capital stock of the bank while discharging his duties as cashier and executive manager is not sustained by the cited authorities.

Counsel for appellees rely strongly on the case of City Nat. Bank of Huron, S. D., v. Fuller, 52 Fed. (2d) 870, as authority for the cashier of the Citizens State Bank to sell or transfer its slow assets now under consideration. We have carefully examined this case in the light of the authorities above cited, but find the cited authority concerned an out-and-out sale of assets in consideration of an assumption of liability of a failing bank. It is true that where a corporation is in failing circumstances, or is in fact insolvent, the *directors and managing officers* may dispose of all the property or make an assignment of all the corporate property for the benefit of the creditors. The cited case is clearly distinguishable from the case at bar.

The cashier and executive manager of this bank, Mr. Ormond, on December 6, 1929, under the law, because of his fiduciary relation, was required to act with the utmost good faith and he did not have the authority while cashier and executive manager to trade, sell or deliver the slow assets of the potential value of $15,200.00 property of the bank, to himself and as trustee for the associate directors without the consent and approval of the officers and stockholders of the bank or a subsequent ratification thereof by the proper authorities of the bank as the law directs, and at the time of the alleged trade, sale or transfer thereof he was handling funds or property of the bank in such a manner as forbidden by law as the alleged trade was to the financial gain, interest and advantage of himself and associate directors surrendering the stock so purchased by

Mr. Nobles. The stockholders, officers and customers of the bank, as well as the general public, were deeply interested in the continued operation of the Citizens State Bank at Marianna after the cashier severed his relation therewith as a stockholder and officer, and these items of tremendous importance appear to have been overlooked.

For the reasons pointed out the decree appealed from is hereby reversed with directions for further proceedings in the lower court not inconsistent with this opinion.

It is so ordered.

Whitfield, P. J., and Brown and Chapman, J. J., concur.

Buford, J., concurs in opinion and judgment.

Justices Terrell and Thomas not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.

## On Rehearing

Per Curiam.—After full consideration pursuant to rehearing granted and oral argument before us, we reach the conclusion that the disposition of the cause depends entirely on the force, effect and sufficiency of the evidence.

The chancellor rendered a full and comprehensive decree detailing his findings of fact and applying legal principles to those findings. The decree finds ample substantial support in the record and therefore should not be disturbed by the Appellate Court.

The decree should be, and is, affirmed.

So ordered.

Terrell, C. J., and Brown, Buford and Thomas, J. J., concur.

Whitfield and Chapman, J. J., dissent.