J. W. YARBROUGH, Appellant, v. W. A. GAGE & COMPANY, INCORPORATED, a Corporation, and R. L. WARD, Trustee.—70 S. W. (2d) 1055.

Division One, April 19, 1934.

*Sharon J. Pate* and *Von Mayes* for appellant.

1148

*Ward & Reeves* for respondents.

1150

FERGUSON, C.—The plaintiff resided at Steele in Pemiscot County, Missouri. He engaged, over a period of many years, in the mercantile business in that county and as a buyer and dealer in cotton, raising, buying and selling cotton. For several years he also owned and operated a cotton gin. Defendant, W. A. Gage and Company, Incorporated, is a nonresident or foreign corporation, incorporated under the laws of the State of Tennessee authorized and engaged in carrying on the business of a cotton factor or merchant with its office and place of business at Memphis, Tennessee. A business arrangement, which continued over a period of ten years or more, existed between plaintiff and Gage & Company whereby plaintiff in the carrying on of his business as a cotton dealer or cotton merchant shipped his cotton to, and marketed it through, Gage & Company, as cotton factors, at Memphis, Tennessee. In 1926 plaintiff executed two promissory notes, one for $8000 and one for $10,000, payable to Gage & Company and at the same time executed a deed of trust, on real property situate in Pemiscot County, securing the payment of said notes, Gage & Company being the beneficiary therein. The terms and provisions of said deed of trust and a "cotton contract" entered into by the parties at the same date and time and as part of the same transaction, as well as something of the history of the course of dealing between them, will hereinafter be more fully stated.

The indebtedness secured by said deed of trust being past due and unpaid Gage & Company in 1929, caused proceedings to be commenced to foreclose the deed of trust. Whereupon plaintiff brought this suit seeking to enjoin and restrain such foreclosure alleging the notes and deed of trust to be void, for that Gage & Company "in procuring said deed of trust and notes from plaintiff . . . was doing business in this State for which it was incorporated under the laws of Tennessee" and that said corporation "was not authorized or licensed to do business in this State . . . and had wholly failed to comply with the laws of this State relative to foreign corporations doing business in this State and in fact at no time has said defendant W. A. Gage & Company, Incorporated, complied with such laws." The petition then states, "that if said deed of trust is valid plaintiff does not owe" Gage & Company "said notes or any part thereof; . . . that since the execution and delivery of said instrument and notes plaintiff has delivered for sale from time to time large quantities of cotton to said defendant" Gage & Company "to be sold according to instructions of plaintiff and the business transactions between plaintiff and said defendant since then have been many and numerous; that said defendant claims to have kept a complete record of all the business transactions between it and plaintiff since and before the execution and delivery of said instrument and notes while the plaintiff has not kept or been able to keep a complete

record of all the business transactions between himself and said defendant" Gage & Company "since or before the execution and delivery of said instrument and notes;" that Gage & Company "fails and refuses to properly account to plaintiff for cotton delivered by plaintiff to it as aforesaid" and "is indebted to plaintiff for damages in the sum of $10,000 or more for failure to sell his said cotton according to true weights or the instructions of plaintiff and therefore plaintiff would have a counterclaim to prosecute against said defendant" Gage & Company "should said company sue plaintiff upon said notes but plaintiff is powerless to offset said matter of counterclaim against said notes in the proceedings of said trustee to foreclose said deed of trust." The prayer of the petition is that "an order be issued at once temporarily restraining" the defendant trustee "from proceeding with the threatened" foreclosure sale "under the power of sale contained in said deed of trust until the matters herein set forth have been heard and adjudicated by the court and" that "on final hearing of this cause defendants be permanently enjoined from selling said property under said deed of trust and that said deed of trust be canceled and for naught held, and, if said deed of trust is valid, then plaintiff prays the court to ascertain and determine the amount of damages due plaintiff from defendant for failure to sell the cotton of plaintiff according to true weights or the instructions of plaintiff and that such amount be offset against said notes and that an accounting be had between plaintiff and defendant to ascertain what amount, if anything, the plaintiff owes on said notes, and that the amounts of the mutual demands or indebtedness between plaintiff and defendant be ascertained and determined and that whatever sums the defendant owes plaintiff the same shall be offset against said notes, and if the court finds after ascertaining and offsetting the mutual demands of plaintiff and defendant against each other plaintiff owes defendant any amount on said notes the court shall adjudge the same and permit plaintiff to pay such amount to defendant and upon the payment of such amount to defendant the court adjudge said deed of trust and notes to be fully paid and satisfied and order and direct defendant to satisfy the record of said deed of trust . . . and restrain defendants from selling said property under said deed of trust." A temporary injunction issued. The answer of Gage & Company admits that "it did not take out a license to do business in the State of Missouri" and avers that "in its business as a cotton factor and in making the loan in question to plaintiff in this case it was not doing business in the State of Missouri so that it was required" by the statutes of this State "to take out a license as a nonresident corporation in Missouri" and "denies that it violated the law" of this State "in that regard." Continuing the answer describes the nature and extent of the business carried on by defendant as a cotton factor and the manner in which same

was conducted, sets forth an alleged course of dealing between plaintiff and Gage & Company over a period of "several years" and the circumstances of the loan which is evidenced by the notes and deed of trust; and asserts that the transactions with plaintiff were not such as required that defendant "take out a license to do business in this State." It is denied that the notes have been paid or that "plaintiff is not indebted to defendant by reason of said notes" or that defendant "failed to sell any cotton by it held . . . for the plaintiff upon request of plaintiff to sell same."

On the trial of the cause the business transactions between plaintiff and defendant covering a period of approximately four years next preceding July 1, 1929, were examined and an accounting made. The court found; that Gage & Company is a foreign corporation "not licensed to do business in this State;" that the mortgage and notes described in the petition were made in this State but were given in a transaction of interstate business and therefore same are valid and can be enforced in this State; "that according to the evidence, accounts, books and records of the defendant W. A. Gage and Company plaintiff owed defendant W. A. Gage and Company a balance on said notes of $15,518.81 on the first day of July, 1929, and that said accounts, books and records are true and correct, except as to the charge of $7859.12 against plaintiff for commissions, which the court finds to be excessive and unreasonable and finds that the defendant W. A. Gage and Company was entitled to charge plaintiff a reasonable sum for commissions, to-wit, the sum of $3500, being $1 per bale for the cotton plaintiff sold by said defendant, and therefore the court finds that the true and correct balance due and unpaid on said notes is $11,209.69, with interest thereon at the rate of six per cent per annum from the first day of July, 1929." Judgment was then entered: "that the temporary injunction be . . . dissolved; that plaintiff pay the defendant W. A. Gage and Company, the balance due on said notes, being $11,209.69 with interest thereon at the rate of six per cent per annum, from the 1st day of July, 1929, and that upon the payment of said balance to said defendant, W. A. Gage and Company, or its agent or attorneys the defendants are enjoined from selling the property described in the deed of trust set forth in the petition . . . and said notes and deed of trust shall be considered paid and fully satisfied."

Both parties have appealed and the case comes here on the joint appeal. The plaintiff assigns as error (1) the finding of the trial court that the notes and deed of trust are valid and enforceable and contends that under the evidence "said deed of trust and notes were void on the ground defendant a foreign corporation was doing business in this State without being licensed or qualified to do business in this State" and (2) that the finding and "judgment that plaintiff was liable to defendant on the notes in question for the sum of

$11,209.12, or any sum, was against the evidence." Defendant, as appellant, claims the trial court "erred, (1) in charging back against defendant $4309.12 as alleged overcharge of commission" and (2) "in not allowing ten per cent of the amount due defendant as attorney's fee."

Manifestly we must first rule plaintiff's insistence that in taking the notes and deed of trust in question defendant, a foreign corporation, was doing business in this State and since it is admitted that defendant had not complied with our statutes prescribing the conditions on which corporations of other States may do business in this State (Secs. 4598-4599, R. S. 1929) the notes and deed of trust are void and unenforceable. This requires a statement of the facts as to the manner in which defendant operated its business as a cotton factor or merchant and the transactions and course of dealing between it and plaintiff in that connection out of which the notes and the deed of trust arose. As stated, and admitted, Gage & Company is a Tennessee corporation organized, as stated in its charter, "for the purpose of carrying on the trade of merchants and cotton factors, engaged in the business of buying and selling cotton and cotton seed on commission or otherwise and making advances to merchants and planters or other growers of cotton either in money, merchandise or property for the purpose of controlling the handling of same on the market." Its *situs* and place of business is at Memphis, Tennessee, where it maintains large warehouses and a corps of weighers and inspectors. Cotton shipped to it to be handled by it as a cotton factor was stored in the warehouses and sold as directed by the owners. It employed salesmen and maintained "sample rooms" in which samples of the cotton which it was offering for sale on the Memphis market were exhibited for examination and inspection by prospective buyers. An office was maintained and a complete record of all transactions with its customers was kept. This affords a brief and general description of its place of business at Memphis. Cotton was shipped to it by its customers or clients, cotton growers, buyers and dealers, in Missouri, Arkansas, Kentucky, Mississippi, Louisiana and Tennessee. Gage & Company stored this cotton in its warehouses and held it for sale as and when ordered or directed by the owners. In carrying on the business it looked after the shipment of the cotton and the unloading at Memphis; advanced and paid the insurance and freight thereon; collected "freight rebates;" attended to the weighing and inspection; took samples from the bale and exhibited same in its sales rooms; advised by correspondence, telephone and telegraph with the owners as to prices and sales; and furnished the owners memoranda, reports and statements covering each shipment and sale and for such services charged its customers a commission of two and a half per cent on sales made. To increase and build up its business and procure and provide for the shipment

of cotton to it Gate & Company, from time to time, would loan or advance money to customers who were growers of or dealers in cotton in the several states mentioned. This was by way of assisting these cotton merchants or dealers to provide the necessary capital to buy and market cotton or finance his business through the cotton season. It was the custom or practice in making these advances to require the customer to execute a note for the principal sum agreed upon as an advancement and secure same by a mortgage on cotton crops or real property which mortgage, as does the one in question herein, specified and provided that the customer would ship to Gage & Company at Memphis, a specified minimum quantity of cotton which was fixed at an amount the value of which would be ample and more than sufficient to pay the advancement and thus afford security therefor. The mortgage was so drawn as to also secure any further advances of money that might be made in addition to the principal sum of the note with provision for the shipment of additional quantities of cotton, on a ratio therein fixed as security for such additional sums as might be advanced. In connection with the note and mortgage it was customary to also take what is denominated a cotton contract whereby the customer agreed and bound himself to ship to Gage & Company stated amounts of cotton in conformity with and as provided for in the mortgage. Gage & Company did not purport to loan money as an investment or to engage in the business, as such, of loaning money. Its credit manager, E. E. Whitner testified: "We are not in the money loaning business; the only reason we loan money is in consideration of the borrower consigning his cotton to us at Memphis to be handled by us on commission. We had that understanding with every one that we loaned money to. Money was loaned in consideration for the agreement to ship cotton to us." The amount of the advance thus provided for was not immediately paid over in full to the customer but he was given a credit therefor upon the books of Gage & Company and as the customer needed funds in carrying on his cotton business he would draw drafts upon Gage & Company which were accepted and paid by it at Memphis. Gage & Company did not maintain or have an office or place of business or agent or employee in this State nor did it buy or sell cotton in this State. Such advances as were made to its customers in this State were either arranged for and agreed upon by correspondence or the credit man from the Memphis office would call upon the customer and discuss the matter. For some six or seven years prior to 1926 plaintiff had been doing business with the defendant Gage & Company, in the manner above indicated, receiving advances from them and pursuant to an agreement so to do shipping them cotton for storage and sale by them, on commission, at their place of business, Memphis. Plaintiff maintained an active and continuing account with Gage & Company. This account extending over a period of many years rep-

resented the transactions had between them in the shipment by plaintiff of cotton to Gage & Company for sale on commission and the advances made by the company and expenses and commissions charged against plaintiff. In continuance of this course of dealing which had existed between them for many years the notes and deed of trust involved herein were executed at Steele, Missouri, under date of August 28, 1926; the note for $10,000 being due and payable on November 1, 1926, after date and the $8000 note on January 1, 1927, after date. The property described in the deed of trust is all situate in Pemiscot County, Missouri. The deed of trust refers to a then existing indebtedness of plaintiff to Gage & Company though the amount thereof is not specified and after describing the notes it is stated that the instrument is executed in consideration of the indebtedness represented by said notes and the agreement of Gage & Company "to make advances of money and supplies to him (plaintiff) between the present date and until this instrument is paid in full and canceled of record" and to secure the payment of the notes described and plaintiff's "present indebtedness to said Gage and Company as well as the advances that it may make to him between now and until this instrument is paid in full." The deed of trust provides that should plaintiff fail to pay "said notes at maturity and said advances the whole of the principal and all other sums hereby secured shall at once become due and payable for all purposes whether for suit on the debt or foreclosure." The deed of trust further sets out that plaintiff "has agreed to ship" Gage & Company "400 bales of cotton by January 1, next and in the event he fails to ship said cotton or all of same" to pay the company a specified amount per bale on the number of bales he fails to ship "as liquidated damages for the failure to carry out his agreement" and it is further specified and agreed that should the company make further advances in addition to and above the amounts specified in the notes, which additional advances are optional with the company, plaintiff "will ship" the company "one bale of cotton for each twenty dollars" so charged to him. It is specified that plaintiff shall pay "six per cent interest per annum on all amounts" that the company "may advance him on open account as well as on the notes described." Under the same date and at the same time plaintiff executed a "cotton contract" whereby, as set out in the deed of trust, he agreed to "deliver or cause to be delivered to the said W. A. Gage and Co., Inc., at their warehouse in the City of Memphis on or before the first day of January next 400 bales of cotton to be sold" by said company "as commission merchants." The cotton contract specifically mentions only the note for $8000 but it provides for the sale of the 400 bales of cotton which plaintiff agrees to ship Gage & Company as commission merchants and that from the proceeds thereof the company "shall first pay" all storage charges on said cotton "and commis-

sion for selling;" "secondly, pay any additional sum advanced me by the said" company "which may not be secured by note;" ". . . thirdly, pay any storage and commission on cotton which I fail to ship as above agreed; and fourthly apply the remainder of the proceeds of said cotton or other payments to the promissory note above mentioned or to any other debit with which I stand charged. W. A. Gage & Co., Inc., having the right, at their option, to apply or change application of payments or make reapplication of payments." Other provisions contained in the deed of trust as to shipment of additional cotton at the rate of one bale for each $20 additional advancement made and charged to plaintiff by the company are also set out in the contract. At the then prevailing price the market value of 400 bales of cotton was "more than $30,000." The two notes, the deed of trust and the cotton contract were executed as of the same date, seem to have been one transaction and to constitute an arrangement between the parties whereby in consideration of defendant making advancement as thereby provided for plaintiff was to ship cotton to defendant at Memphis to be there handled and sold by it in the course of its business as a cotton factor. The various instruments were prepared, dated and executed in this State, sent to the office of the company at Memphis for approval, were there approved and the deed of trust was then recorded. As we have stated, the money advanced was thereafter paid out by defendant at Memphis, from time to time, on drafts drawn by plaintiff.

Separating or segregating the execution and taking of the notes and deed of trust from the transactions out of which they arise and of which they are a component part the plaintiff seems to direct his argument to the proposition that said instruments are Missouri contracts and that the mere act of subscribing and executing same in Missouri and the acceptance thereof by defendant constitutes a doing of business in this State by defendant, a foreign corporation, within the meaning of our statutes. But when we consider the nature of the business carried on by defendant, the manner thereof and the substance of the whole transaction out of which the notes and deed of trust arise and with which they are immediately and directly connected it is obvious that the instruments do not evidence or represent debts growing out of business done or carried on by the defendant in this State nor do they contemplate or provide for the doing of business in this State by defendant; rather the whole and continuous course of dealing between plaintiff and defendant and the particular phase thereof involved in the taking of the notes and deed of trust appears to have been the transaction and carrying on of business of an interstate character and therefore not within the purview of the statutes which plaintiff invokes. The notes and deed of trust in question being incidental to, an appropriate part of and inseparably linked with interstate commercial transactions must be

treated as legitimate and valid notwithstanding defendant's noncompliance with the State statutes for the requirements of a state statute governing the doing of business by a foreign corporation within the State are not applicable to transactions by and with such corporation in interstate commerce. [Yerxa, Andrews & Thurston v. Randazzo Macaroni Mfg. Co., 315 Mo. 927, 288 S. W. 20; Hess Warming & Ventilating Co. v. Burlington Grain Elevator Co., 280 Mo. 163, 217 S. W. 493; Security State Bank v. Simmons, 251 Mo. 2, 157 S. W. 585; International Text-Book Co. v. Gillespie, 229 Mo. 397, 129 S. W. 922; General Excavator Co. v. Emory (Mo. App.), 40 S. W. (2d) 490; J. B. Colt Co. v. Watson, 215 Mo. App. 467, 247 S. W. 493; Gutta Percha Mfg. Co. v. Lehrack, 201 Mo. App. 550, 214 S. W. 285; The J. R. Watkins Medical Co. v. Holloway, 182 Mo. App. 140, 168 S. W. 290; Dinuba Farmers' Union Packing Co. v. J. M. Anderson Grocer Co., 193 Mo. App. 236, 182 S. W. 1036; Rogers v. Union Iron & Foundry Co., 167 Mo. App. 228, 150 S. W. 100; German American Bank v. Smith, 202 Mo. App. 133, 208 S. W. 878; Butler Bros. Shoe Co. v. United States Rubber Co., 156 Fed. 1; International Text-Book Co. v. Pigg, 217 U. S. 91; Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282; Lemke v. Farmers' Grain Co., 258 U. S. 50; Furst v. Brewster, 282 U. S. 493; Palmer v. Aeolian Co., 46 Fed. (2d) 746.] Dahnke-Walker Milling Company v. Bondurant, 257 U. S. 282, was an action to recover damages for breach of contract for the sale and delivery of a wheat crop estimated at 14,000 bushels. The plaintiff, a Tennessee corporation, operated a flour mill at Union City, in that State. Defendant resided at Hickman, Kentucky, and engaged in farming in that vicinity. Plaintiff and defendant entered into a contract at Hickman, Kentucky, a Kentucky contract, whereby defendant agreed to sell and plaintiff to purchase defendant's wheat at a stipulated price. Delivery was to be made on board the cars of a common carrier at Hickman, Kentucky. Plaintiff intended to ship the wheat to its mill in Tennessee. A small part of the crop was delivered as agreed but delivery of the remainder was refused. At the time for delivery wheat had come to be worth several cents per bushel more than the contract price. The action was brought in a state court in Kentucky. A defense was interposed that plaintiff had not complied, as was the fact, with a statute of Kentucky prescribing the conditions on which corporations of other states might do business in that State and that the contract was therefore not enforceable. Plaintiff replied that the transaction was in interstate commerce and therefore the Kentucky statute invoked did not apply. The trial court held that the statute did not apply to the transaction in question and the plaintiff had verdict and judgment, but the Kentucky Court of Appeals while "conceding the invalidity of the statute as respects transactions in interstate commerce held the transaction was not in such commerce" and therefore the statute was ap-

plicable. The case went, on a writ of error, to the United States Supreme Court. That court declaring the applicable law said:

"The commerce clause of the Constitution, . . . expressly commits to Congress and impliedly withholds from the several states the power to regulate commerce among the latter. Such commerce is not confined to transportation from one state to another, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. Where goods in one state are transported into another for purposes of sale the commerce does not end with the transportation, but embraces as well the sale of the goods after they reach their destination and while they are in the original packages. (Cases cited.)

"On the same principle, where goods are purchased in one State for transportation to another the commerce includes the purchase quite as much as it does the transportation. (Cases cited.)

"This has been recognized in many decisions construing the commerce clause. . . . In United States v. E. C. Knight Co., 156 U. S. 1, 13, 'contracts to buy, sell, or exchange goods to be transported among the several States' were declared 'part of interstate trade or commerce.' And in Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 241, the court referred to the prior decisions as establishing that 'interstate commerce consists of intercourse and traffic between the citizens or inhabitants of different states, and includes not only the transportation of persons and property . . . but also the purchase, sale and exchange of commodities.' In no case has the court made any distinction between buying and selling or between buying for transportation to another State and transporting for sale in another State. Quite to the contrary, the import of the decisions has been that if the transportation was incidental to buying or selling it was not material whether it came first or last.

"A corporation of one State may go into another, without obtaining the leave or license of the latter, for all the legitimate purposes of such commerce; and any statute of the latter State which obstructs or lays a burden on the exercise of this privilege is void under the commerce clause. [Crutcher v. Kentucky, 141 U. S. 47, 57; Western Union Telegraph Co. v. Kansas, 216 U. S. 1, 27; International Textbook Co. v. Pigg, 217 U. S. 91, 112; Sioux Remedy Co. v. Cope, 235 U. S. 197.]"

Referring then to the facts the court said:

"It had been the practice of the plaintiff to go into Kentucky to purchase grain to be transported to and used in its mill in Tennessee. On different occasions it had purchased from defendant. . . . This contract was made in continuance of that practice, the plaintiff intending to forward the grain to its mill as soon as delivery was made. . . . Applying to these facts the principles before stated we think the transaction was in interstate commerce. The state court,

stressing the fact that the contract was made in Kentucky and was to be performed there, put aside the further facts that delivery was to be on board the cars and that the plaintiff in continuance of its prior practice, was purchasing the grain for shipment to its mill in Tennessee. We think the facts so neglected had a material bearing and should have been considered. They showed what otherwise seemed an intrastate transaction was a part of interstate commerce. (Cases cited.)"

In Lemke v. Farmers' Grain Company, 258 U. S. 50, a North Dakota Association in the general and usual course of the business which it carried on bought grain in that state and placed the grain in elevators from which it was loaded on cars and shipped to other states for sale. Even after loading the grain was subject to be diverted and sold within the State if a satisfactory price was offered but local sales were unusual and practically all of such grain was marketed in other states. Citing the case of Dahnke-Walker Milling Co. v. Bondurant, supra, the Federal Supreme Court held that the business, including the buying of the grain, in North Dakota was interstate commerce and that a statute of North Dakota regulating the buying and selling of grain as applied to the facts was a burden upon interstate commerce. In the two foregoing cases, and the cases therein cited, the purchase of commodities in one state for transportation to another state was held to be a transaction in interstate commerce and contracts relating thereto and directly and immediately connected therewith declared to be a "part of interstate trade or commerce." While in the instant case Gage & Company, did not purchase defendant's cotton it did in continuance of a long course of dealing between it and plaintiff advance money to plaintiff under the terms of the deed of trust and cotton contract whereby plaintiff agreed to ship not less than a fixed quantity of cotton to defendant at Memphis, Tennessee, to be handled and sold by it at its place of business there, as a factor and upon commission. The credit was extended to plaintiff in consideration of his agreement to ship cotton to defendant to be handled by it, at Memphis, in the customary manner. We think there can be no question that the transaction as a whole was interstate trade, business or commerce and that the cotton contract, deed of trust and notes, evidencing and providing for the advancements or credit so extended plaintiff must be considered a "part of" such "interstate trade or commerce." It will be remembered that Gage & Company, neither bought nor sold any cotton in this State nor did it exercise or attempt to exercise, in this State, any function or privilege or do any business disassociated and separate from its interstate business and which could be classed as purely intrastate business. It is true that at no time did plaintiff sell any cotton to Gage & Company nor did the company purchase any cotton from plaintiff nevertheless under the facts shown the transactions between

the parties constituted and involved commercial intercourse of an interstate character. That a sale is not the test of interstate commerce is definitely stated in Butler Brothers Shoe Co. v. United States Rubber Co., 156 Fed. 1, and reaffirmed by the Federal Supreme Court in cases to which we shall presently refer. In the Butler Bros. case the United States Rubber Company, a manufacturing corporation of the State of New Jersey, entered into a contract with Butler Bros. Company, a corporation of the State of Colorado doing a wholesale business in that state whereby the Butler Bros. Company, was designated and appointed as agent of the rubber company, to sell goods manufactured by the rubber company, in the State of Colorado upon the terms and a commission basis specified in the contracts. Such goods were to be consigned by the rubber company, to the Butler Bros. Company, upon its orders. Necessarily the goods so ordered would be shipped to the Butler Bros. Company, in Colorado from the factories of the rubber company, in other states. The contract provided that the goods and the proceeds thereof should remain the property of the rubber company, until Butler Bros., paid the rubber company, the agreed price of goods so consigned to it and that a separate bank account covering all transactions in connection with the consignment to and sale by Butler Bros., of such goods should be maintained by it. The contract was made in and was a Colorado contract. In a suit by the rubber company for a balance alleged to be due and for an accounting under the contract the Butler Bros. Company contended that the contract was void and illegal on the ground that the complainant rubber company, was a foreign corporation and that in making and performing such contract it had engaged in and carried on business in the State of Colorado without a license and in violation of the statutes of that State. It was held that the contract in question was a "contract of factorage." The court then lays down the proposition, supported by a lengthy citation of authorities (see page 15) that: "Every corporation, empowered to engage in interstate commerce, . . . may carry on interstate commerce in every state in the Union, free of every prohibition and condition imposed by the latter." The opinion then propounds the query whether the contract "in suit" was a transaction of interstate commerce. It is observed that "the place of their execution (of the contract) is immaterial . . . because the right of the rubber company was as absolute to make and to perform a contract of interstate commerce in Colorado as in New Jersey." It is then said:

"Nor is the fact" that the contract "did not evidence sales of the goods determinative of this question. A sale is not the test of interstate commerce. All sales of sound articles of commerce, which necessitate the transportation of the goods sold from one state to another, are interstate commerce; but all interstate commerce is not sales of goods. Importation into one state from another is the in-

dispensable element, the test, of interstate commerce; and every negotiation, contract, trade, and dealing between citizens of different states, which contemplates and causes such importation, whether it be of goods, persons, or information, is a transaction of interstate commerce. 'Since the case of Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23,' said Chief Justice WAITE in Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 8, 24 L. Ed. 708, 'it has never been doubted that commercial intercourse is an element of commerce which comes within the regulating power of Congress.' ''

The opinion further holds that the contract "constituted and caused commercial intercourse between citizens of different states;" that its "chief purpose and . . . principal effect" was "importation of . . . articles of commerce into the State of Colorado from other states;" that it "necessarily constituted a transaction of interstate commerce;" and that as the contract was a transaction "of interstate commerce, any prohibition or obstruction to the making . . . or to the enforcement" thereof "by the legislation or action of the State of Colorado, was beyond the power of the State and futile." The conclusion is that: "The transaction . . . was interstate commerce. The rubber company did not agree to do, and did not actually do, any of the business of receiving, storing, and selling the goods in Colorado. The shoe company did agree to do, and did do, that business." Citing numerous cases in support of the proposition it is said in United States v. Tucker, 188 Fed. 741, 743: "Every negotiation, initiatory and intervening act, contract, trade and dealing between citizens of any state, . . . with those of another" state "which contemplates and causes" importation "into one state from another state of goods, persons or information is a transaction of interstate commerce." International Textbook Co. v. Pigg, 217 U. S. 91, cites and quotes with approval the pronouncement made in Butler Bros. Shoe Co. v. United States Rubber Co., supra, and the Federal Supreme Court says: "In the great case of Gibbons v. Ogden, 9 Wheat. 1, 189, this court speaking by Chief Justice MARSHALL said, 'Commerce, undoubtedly, is traffic; but it is something more; it is intercourse' . . . It is said in the Circuit Court of Appeals for the Eighth Circuit, speaking by Judge SANBORN in Butler Brothers Shoe Co. v. United States Rubber Co., 156 Fed. 1, 17, that 'all interstate commerce is not sales of goods. Importation into one state from another is the indispensable element, the test, of interstate commerce; and every negotiation, contract, trade and dealing between citizens of different states which contemplates and causes such importation, whether it be of goods, persons or information, is a transaction of interstate commerce.' '' This test as laid down in the Butler Bros. case is again quoted, reaffirmed and applied by the Federal Supreme Court in Furst & Thomas v. Brewster, 282 U.

S. 493. The plaintiffs, Furst & Thomas, copartners, doing business in Freeport, Illinois, brought that suit in a state court of Arkansas against defendant Brewster, a resident of Warren, Arkansas, "to recover for goods sold and delivered to him pursuant to a contract, the performance of which was alleged to have been guaranteed by" the other defendants. By the terms of the contract the firm of Furst & Thomas "agreed to sell and deliver to Brewster, on board cars at Freeport, Illinois, or at their option at their nearest branch warehouse, at their current wholesale prices their products . . . as ordered by him so long as the contract was in force and his account was in satisfactory condition." Furst & Thomas agreed to give to Brewster free advice as to the best methods of selling the goods to consumers. "Brewster agreed to pay Furst & Thomas the regular wholesale prices, . . . payments to be made weekly according to his cash sales and collections. On the termination of the contract, Brewster was to have the privilege of returning to Furst & Thomas his stock of unsold goods." The defendants pleaded, that the goods delivered by the plaintiffs to Brewster were manufactured by the Furst-McNess Company, an Illinois corporation with its place of business in that state; that in making the contract and deliveries of goods thereunder, Furst & Thomas acted as agents of the Furst-McNess Company; that the Furst-McNess Company had failed to comply with the statute of Arkansas pertaining to the doing of business by a foreign corporation in that state and therefore the suit could not be maintained as the statute of Arkansas expressly forbade it. "At the trial the terms of the contract, as above stated, and the transactions under it, were shown. It appeared that Furst & Thomas did business at Freeport, Illinois; that they received at that place orders from the defendant Brewster; and that the goods so ordered were shipped to Brewster at Warren, Arkansas, from the branch warehouse of Furst & Thomas at Memphis, Tennessee. The goods thus shipped had been obtained by Furst & Thomas in Illinois from the Furst-McNess Company, an Illinois corporation doing business at Freeport, Illinois. It was admitted that this corporation had not been authorized to do business under the laws of Arkansas. Evidence was also introduced for the purpose of showing that Furst & Thomas were agents of the Furst-McNess Company and to support the contention that the transactions between Furst & Thomas and the defendant Brewster under the contract in suit were those of principal and agent.

"The evidence was submitted to the jury upon the question of agency. The court refused to give the instruction, which the plaintiffs requested, that the statutes of Arkansas had no application, for the reason that, if applied, they would contravene Article 1, section 8, clause 3, of the Constitution of the United States giving to the Congress power to regulate commerce among the States. The jury found in favor of the defendants." The Supreme Court of Arkansas

following its earlier decision in a similar case (Furst & Thomas v. Hartzell, 172 Ark. 1118) affirmed the judgment. It was held "that the determinative question was whether the relationship between the parties was that of vendor and vendee or principal and agent." In an opinion by Chief Justice HUGHES the Federal Supreme Court held that in determining whether the transactions were in interstate commerce it was immaterial whether or not Furst & Thomas were agents of the Furst-McNess Company or Brewster an agent of Furst & Thomas. It is said: "These transactions were clearly in interstate commerce, whether or not Furst & Thomas were agents of the Furst-McNess Company, and whether or not Brewster was an agent of Furst & Thomas. In pursuance of orders sent by Brewster in Arkansas to Furst & Thomas in Illinois, goods were shipped to Arkansas from the branch warehouse of Furst & Thomas in Tennessee. The ordering and shipment of the goods constituted interstate commerce, and the obligation to pay and the right to recover the amount due, according to the contract pursuant to which the goods were sent, arose in the course of that commerce." The opinion then quotes with approval the pronouncement, supra, made in Butler Bros. Shoe Co. v. Rubber Co., and adds: "Such commerce comprehends all the component parts of commercial intercourse between different states, and, according to established principle, any state statute which obstructs or lays a direct burden on the exercise of the privilege of engaging in interstate commerce is void under the commerce clause." (Cases cited.)

Applying the principles of law announced in the cases cited and reviewed to the facts of the case before us we must approve and affirm the action of the trial court in overruling plaintiff's contention in that regard and holding the notes and deed of trust to be valid and enforceable.

Coming now to the accounting side of this suit a question is casually suggested in the briefs as to the authority of the court under the pleadings in this case to take an accounting between the parties and make a finding thereon, however neither party makes that point and the testimony of both parties is directed to an examination of the account between them from June 22, 1925, to July 1, 1929, and the finding and judgment of the trial court is made as of date of July 1, 1929. Each appellant challenges the correctness of that finding. Plaintiff claims the trial court erred in not assessing, and allowing him a credit for, damages for losses he claims to have sustained on account of the alleged failure of the defendant to sell his cotton which defendant had in storage during year 1928 as and when ordered by him to sell same and also in refusing to allow his claim for alleged overcharge on account loss in weights of his cotton sold by it. On the other hand defendant complains that the trial court erred in

"charging back against defendant $4309.12 as overcharge of commission."

We shall first consider plaintiff's complaints. The petition states that the "business transactions between plaintiff and defendant . . . have been many and numerous" but that plaintiff "has not kept, nor been able to keep a complete record of all the business transactions between himself and said defendant, W. A. Gage and Company." Plaintiff testified, that he did not keep "any book or account" of his transactions with the Gage Company; that when he "drew drafts" he "would put the amount on the stub;" that he did not know how much money he had drawn in that manner; that "they were supposed to give me credit for the cotton they sold down there that belonged to me;" that he "did not keep any books or any records of the amount of the drafts I drew or the amount of cotton I shipped or what they got for it;" and that "when I bought cotton I gave a check for it and put on the stub who the bale was bought from and where it was ginned and I had the bills of lading for the cotton I shipped to them; those were the only records I had." In this situation plaintiff employed W. J. Peck, "public accountant" to make an audit, in his behalf, of the account with defendant. In making the audit Mr. Peck says he was supplied by plaintiff with such information, statements and memoranda as plaintiff was able to furnish; that he went to Memphis and checked defendant's books and found "the books to be in good condition;" that Gage & Company, "did not refuse to furnish me with any information" but "gave me the information on every item that I asked for." The accountant stated that his audit commenced with June 22, 1925, on which date there was a balance due plaintiff of $4591.17 "and the audit included that amount." The audit covered the period from that date to and including July 1, 1929. Two separate and distinct accounts were kept. One was referred to throughout the evidence as the open account, the other as the purchase account. The plaintiff's audit, made as aforestated, showed that during the period from June 22, 1925 to July 1, 1929, plaintiff had shipped to Gage & Company and the company acting as a factor had stored, handled at and through its offices and warehouses at Memphis and sold on commission, in the manner we have heretofore described, 3002 bales of cotton; that by drafts on Gage & Company plaintiff had drawn $258,700; that Gage & Company had paid the insurance, freight, commissions, etc., and charged same against plaintiff and that of July 1, 1929, there was a balance in favor of plaintiff on this account (referred to as the open account) of $8438.97 against which the auditor or accountant charged interest on the two notes involved to date of July 1, 1929, in the amount of $1763.30, leaving a credit balance in that account of $6675.63 in plaintiff's favor. The purchase account covered transactions in a distinctly different course of dealing. That account was

a record of cotton purchased between December 9, 1927, and September 1, 1928, by Gage & Company, at Memphis, for and at the request of plaintiff and to his account, stored in its warehouses at Memphis and resold by it as and when ordered by plaintiff. The usual and customary expenses occurring in the handling of this cotton were charged to plaintiff. The account shows 548 bales of cotton handled in this manner. For that cotton Gage & Company buying at plaintiff's direction paid $56,886.14, and by selling in amounts and at the times ordered by him there was a gross profit of $1023.15 but the expenses charged, storage, insurance, commission, etc., aggregated $5,217.59, which left a balance due Gage & Company in the purchase account of $4,194.44. The audit then shows the difference between the two accounts to make a balance of $2481.19 in plaintiff's favor. This credited upon the principal sum of the notes, $18,000, reduced the amount due thereon as of July 1, 1929, to $15,518.81. By reference to the finding and judgment of the trial court it will be seen that the court found the amounts shown by the audit, and so arrived at, to be "true and correct" except only as to the charge for commission which the court found to be excessive and unreasonable and of that later.

As to plaintiff's contention that in refusing his claim for damages which he alleges he sustained by reason of the failure of Gage & Company, in 1928, to sell his cotton, then in storage, when directed by him to do so, the court's finding was against the weight of the evidence we think a reading of the evidence set out in this record bearing upon that matter, leaving out of consideration the trial court's opportunity to judge of the credibility of the witnesses, requires us to sustain the finding of the trial court thereon. The plaintiff's testimony in support of this claim is vague, indefinite and uncorroborated and is refuted by his own letters written to Gage & Company during the time to which his testimony refers. The substance and tenor of these letters is that his cotton not be sold at that time, the expression of a belief that cotton prices would advance, requesting that his cotton be held and that the company buy and hold cotton for him to replace small quantities of his cotton which it had sold.

Nor is the evidence offered by plaintiff to sustain his claim of overcharge by defendant on account of loss in weights such as to require or justify us to set aside the finding of the trial chancellor on that issue as being against the weight of the evidence. The plaintiff was unable to produce a complete or accurate record of his weights on the cotton shipped to defendant. A complete and original record of the weight of each bale of cotton shipped by plaintiff to Gage & Company during the period to which plaintiff's audit and the accounting made by the court was confined, at the time same was received at its warehouses by the company and a like record of the weight at the time the cotton was sold was offered in evidence by the defendant. These

same records were supplied plaintiff's accountant who examined and checked same in the course of the audit which he made. The evidence was that Gage & Company was a member of the Memphis Cotton Exchange and operated under the rules of that organization; that the Gage & Company scales were duly tested and approved as to accuracy and all cotton as received or sold was weighed by "licensed and bonded weighers." Much of plaintiff's cotton was held in storage in defendant's warehouse for a year and some more than a year before he ordered it sold. There is no evidence tending to show that it was not properly stored or that defendant did not exercise due care in protecting and handling same; nor is there any evidence that defendant's scales were not accurate or in proper condition. Both plaintiff's and defendant's evidence was to the effect that cotton in storage would lose weight. Plaintiff's evidence was that "after a bale of cotton is put in the compress it loses weight; in sixty days to six months the loss will be about six pounds per bale" and "after being kept there for a year or above six months the further loss of weight will not be over two pounds." The average loss in weight on plaintiff's cotton as shown by the difference in weights when received and when sold was but 2.62 pounds per bale. Gage & Company sent plaintiff a fully itemized report covering each shipment or sale of cotton. The report showed the number of bales of cotton, the weight and markings of each bale and printed thereon was a notation: "We call your attention to weights shown in the weight column. We suggest that you compare weights and advise us of any discrepancies." Plaintiff on a few occasions wrote Gage & Company complaining about the weights so reported. At such times the company either by letter or telephone requested plaintiff to come to Memphis, at its expense, and "see the cotton weighed" but plaintiff did not do so, however "on one or two" such occasions plaintiff's cousin who resided in Memphis went, at plaintiff's request, to defendant's warehouse, saw the cotton weighed "and expressed himself as being satisfied" with the correctness of the weights. We deem it unnecessary to further set out or review the evidence relating to weights and think it suffices to say that on that issue the weight of the evidence is clearly with the defendant as the trial court found.

We come now to a consideration of defendant's assignments. The court found the commission charged by Gage & Company "to be excessive and unreasonable;" that the company "was entitled to charge plaintiff a reasonable sum for commission" and that "$1.00 per bale" was a reasonable commission. As a total of 3550 bales of plaintiff's cotton where handled by defendant during the period covered by the accounting (3002 through the open account and 548 through the purchase account) the commission allowed by the court was fixed at $3550. The total commission charge shown by Gage &

Company books and the audit made by plaintiff's accountants was $7859.12. The commission rate, i. e., two and one-half per cent, charged against plaintiff by Gage & Company was that which it uniformly and regularly charged all customers on transactions of the kind had with plaintiff. For more than ten years of continuous dealing plaintiff had been uniformly charged the same rate of commission. A written report of each sale however small was made to plaintiff. This report showed the rate, and amount of commission charged. Statements of the account were, from time to time, sent plaintiff over the period of years which marked their dealing showing the commission charged. At no time did plaintiff ever object to the rate charged. Nor is any claim made by plaintiff in his petition that the rate of commission charged was unreasonable or excessive or not the usual and customary rate charged in such transactions at Memphis. In all the years of dealing between them plaintiff acquiesced without any complaint or objection in the rate charged. There seems to have never been any specific agreement about the rate of commission but their dealing clearly was on the basis of the usual and customary rate charged in like transactions in Memphis. Gage & Company had been in business sixty-five years. The evidence is that continuously for more than twenty years next preceding this trial the rate of commission charged plaintiff had been the fixed, usual, customary and regular commission charged in transactions such as those had with plaintiff. Further all the testimony as to transactions of the kind had between plaintiff and defendant was that the per centage charged was the usual and cutomary factorage commission at the Memphis market, nor was there any testimony on the part of plaintiff to the contrary. The evidence shows that cotton factors at Memphis sell cotton in two ways. (1) Where the owner ships the cotton to the factor who receipts therefor and stores it in warehouses, protects and cares for same, pays the insurance and freight thereon, collects the freight rebates, selects samples and exhibits same in salesrooms, submits offers to the owner, holds the cotton, financing same in the meantime, subject to sale at the owners' orders and keeps records and accounts on all transactions in connection with handling same. The cotton is oftimes, as in this instance, held in storage for a year and more. This was the method of dealing between plaintiff and defendant. While 548 bales of its cotton involved in the accounting were not actually shipped by plaintiff to defendant yet as to that cotton, which is as heretofore mentioned covered by the purchase account, defendant at plaintiff's request bought cotton at Memphis in that amount for plaintiff's account, advancing the purchase money, took same into and stored and held it in its warehouses as plaintiff's cotton, paying insurance and other expenses thereon, exhibited samples thereof in its salesroom and held

same over a long period of time subject to, and sold same only at, plaintiff's order. It appears that the commission on cotton so handled comes within the same rate as that charged on cotton shipped by the owner direct to the factor. The testimony is all one way that the usual, customary and uniform charge made by cotton commission merchants or factors at Memphis, including Gage & Company, for handling cotton in the manner above outlined, and as all of plaintiff's cotton was handled, is two and one-half per cent, the commission charged plaintiff. (2) The other method by which cotton factors at Memphis sold cotton is referred to in the evidence as the F. O. B. method. The owner does not ship the cotton to the factor. The cotton is held by the owner at the local compress or warehouse and he merely sends the factor a sample which the commission merchant exhibits in the salesroom. If an offer is made the factor immediately communicates the offer by telephone or telegraph to the owner. If the offer is satisfactory the owner accepts and forwards the ware-house receipts to the factor who delivers same to the buyer in Memphis and the deal is thereby consummated. According to the evidence the usual and customary commission for such sale is $1 a bale. It is true that some of the witnesses for plaintiff testified that the usual factorage commission at Memphis was $1 per bale, but in each instance it developed that the witness referred to cotton sold by the latter method. Apparently the trial chancellor overlooked the distinction. The writer is unable to find any testimony which accorded the construction most favorable to plaintiff is of a quality and substance sufficient to sustain plaintiff's contention in this respect and overcome the great weight of the evidence showing that defendant charged plaintiff only the usual and ordinary commission for the services rendered by it as a factor in handling his cotton. It does not appear to be a matter of the weight of the evidence on this issue as between the parties, but rather a lack of any substantial evidence in the record to support the action of the trial chancellor in reducing the rate of the commission. In this situation, since the correctness of the amount of the commission charges is in nowise challenged if the rate charged be found proper, the judgment should be corrected so as to allow defendant the amount due it as shown by its books and records and the audit made by plaintiff's accountant; so that judgment be for defendant Gage & Company for the balance thereby shown to be due on said notes, as of July 1, 1929, in the amount of $15,518.81.

■ Defendant also assigns as error the failure and refusal of the trial court to allow it an attorney's fee as provided for by the terms of the notes involved. It will be remembered that plaintiff took the position first that the notes and deed of trust were absolutely void and unenforceable and second that if same were held to be valid that he was entitled to an offset or credit upon the notes for damages on

the grounds heretofore discussed. These claims for damages were ruled against plaintiff by the trial chancellor and we have held that the reduction or credit which the trial chancellor did allow was not, under the evidence, properly made. The proper judgment on the notes, as we view the matter and as we have directed, is in the exact amount claimed by defendant as of the 1st day of July, 1929. The plaintiff not only denied the validity of the notes but also that any amount was due and owing to defendant thereon if same were valid. By this suit defendant was compelled to meet these issues, sustain the validity of the notes and enforce same by resisting plaintiff's various claims for credits or offsets and establish its right to recover thereon. To do so defendant necessarily was required to employ attorneys to represent it. Each of the notes provide: "If this note is not paid at maturity and is placed with an attorney for collection, . . . I agree to pay all costs incurred by the holder in collecting or enforcing the same including a fee of ten per cent on amount due for attorney's fee." We think the necessity of employment of attorneys by defendant to defend this action, maintain the validity of the notes, resist plaintiff's claims as to offsets and credits to which he alleged he was entitled and enforce the obligation of plaintiff thereon comes within the contemplation and meaning of terms above quoted. Plaintiff does not plead nor at any stage of the proceedings does he advance the claim that ten per cent "on amount due" is an unreasonable or excessive attorney's fee. The writer does not find this matter discussed in plaintiff's brief. Seemingly he acquiesces in the proposition that if defendant is entitled to recover on the notes it would be entitled to an attorney's fee of ten per cent of the amount found to be due. The judgment should therefore be further amended so as to assess an attorney's fee in favor of defendant of ten per cent of the amount due, as aforesaid, on said notes as of July 1, 1929.

The judgment is reversed and the cause remanded with directions to the trial court to amend and enter same in conformity with this opinion. *Sturgis* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.*, absent.